MACKE LAUNDRY SERVICE LIMITED PARTNERSHIP, Appellant,

v.

JETZ SERVICE CO., INC., et al., Defendant,

Ronald Byers, et al., Respondents.

No. WD 50935.

Missouri Court of Appeals, Western District.

Aug. 27, 1996.

Stephen G. Mirakian, Wyrsch, Atwell, Mirakian, Lee & Hobbs, Kansas City, for appellant.

Lindsay K. McFerrin, Miller, Dougherty & Modin, Kansas City, for respondents.

Before BRECKENRIDGE, P.J., and LAURA DENVIR STITH and EDWIN H. SMITH, JJ.

BRECKENRIDGE, Presiding Judge.

Macke Laundry Service Limited Partnership appeals from the trial court's order granting summary judgment in favor of Ronald Byers and the law firm of Newhouse, Byers & Swaney, P.C. Macke contends that the trial court erred by granting summary judgment on its claim that Mr. Byers conspired with his client, Jetz Service Co., Inc., to commit tortious interference with contract rights, champerty and maintenance of litigation,[1] and malicious prosecution. Specifically, Macke claims that it was error for the trial court to hold that, as a matter of law, an attorney is immune from

---

1. The doctrines of champerty and maintenance were developed at the common law to "prevent officious intermeddlers from stirring up strife and contention by vexatious and speculative litigation which would disturb the peace of society, lead to corrupt practices, and prevent the remedial process of the law". Maintenance is defined as "an officious intermeddling in a suit which in no way belongs to one, by maintaining or assisting either party, with money or otherwise, to prosecute or defend it". Champerty, a species of maintenance, consists of an agreement under which a person who has no interest in the suit of another undertakes to maintain or support it at his own expense in exchange for part of the litigated matter in the event of a successful conclusion of the cause. *Schnabel v. Taft Broadcasting Company, Inc.*, 525 S.W.2d 819, 823 (Mo.App.1975) (citations omit-

ted). The court in *Schnabel* recognized that the common law actions of maintenance of litigation and champerty are rare in modern times, having been replaced by the causes of action of abuse of process, wrongful initiation of litigation and malicious prosecution. *Id.* at 824. Nevertheless, the law of champerty and maintenance have been found to be in force in this state by the Missouri Supreme Court. *Curry v. Dahlberg*, 341 Mo. 897, 110 S.W.2d 742, 748 (banc 1937). *See also Moffett v. Commerce Trust Company*, 283 S.W.2d 591, 596 (Mo.1955). This court is bound by the last controlling decision of the Supreme Court, *State ex rel. Quest Commun. v. Baldridge*, 913 S.W.2d 366, 371 (Mo.App.1996), so the continued viability of champerty and maintenance is left to that Court.

liability for civil conspiracy with the attorney's client unless the attorney is individually liable for the underlying tort or the attorney had a personal interest in the commission of the underlying tort.

The judgment of the trial court is affirmed.

On appeal from summary judgment, this court will review the record in the light most favorable to the party against whom judgment was entered. *ITT Commercial Finance v. Mid–Am. Marine*, 854 S.W.2d 371, 376 (Mo. banc 1993). Macke and Jetz are business entities which leased laundry rooms in apartment buildings, where they installed their coin-operated laundry machines for use by the buildings' other tenants. Macke and Jetz competed for the right to be the exclusive provider of laundry machines at various locations in the Kansas City area, including apartment complexes known as Fox Crossing, Broadway Village, Briarwood Hills, and Oak Rose/Sal Marco.

*Fox Crossing*

On October 1, 1986, Macke entered into a five-year lease with the owner of the Fox Crossing property. The lease included the following "right of first refusal" provision:

Should Lessor, upon the expiration of the initial or any renewal lease term, or within 12 months thereafter, elect to lease the Premises to any other person or entity similarly engaged in the business of operating automatic laundry equipment, Lessee shall have the right of first refusal to meet any bona fide offer to let the Premises on the identical terms and conditions of such offer.

On June 20, 1988, the owner of the Fox Crossing property entered into a five-year lease with Jetz to begin October 1, 1991. On July 21, 1988, the owner informed Macke that it would not renew its lease with Macke.

In a letter dated April 19, 1991, the owner told Macke that its right of first refusal was invalid due to Macke's "inability to provide the requested equipment." In another letter sent ten days later, the owner identified the "requested equipment" as a coin box security system matching certain specifications, as supplied by Jetz. The coin box security system was under the control of a company affiliated with Jetz which would not sell to Macke. Macke then made a demand for arbitration, as provided by its lease with the owner. On October 2, 1991, the arbitrator ruled that Macke had a right of first refusal to meet the terms of the Jetz lease because the coin box security system was not a term or condition of the Jetz lease.

While the arbitration was pending, a further provision was added to the Jetz lease for the Fox Crossing property. The lease addendum, dated August 27, 1991, provided that "[e]ither party may terminate this lease *for any reason by written notice during the* first thirty-six hours after the execution of this lease." Mr. Byers drafted this "thirty-six hour" clause for Jetz.

On October 4, 1991, Macke exercised its right of first refusal by submitting a lease to match the terms of the Jetz lease. In response to Macke, the owner's attorney drafted a letter demanding that Macke vacate the premises. The letter, which was dated October 10, 1991, observed that Macke was purporting to match the terms of a Jetz lease which included a thirty-six hour termination clause. The letter stated that Macke had adopted the thirty-six hour termination clause by matching the terms of Jetz's lease, and that the owner was electing to exercise that clause to terminate the lease with Macke.

On October 10, 1991, the owner's attorney sent a copy of the letter to Jetz's counsel, Mr. Byers, along with a cover letter asking Mr. Byers to review the language of the letter to Macke. Mr. Byers then sent by facsimile transmission of a copy of both letters to Donald Sommers, who was Jetz's local manager. The transmittal page of the fax included the remark, "Maybe our trap will work."

Macke did not vacate the premises, and on January 22, 1992, the owner's attorney sent a letter to the owner of the Fox Crossing property stating that Mr. Byers had directed the owner's attorney to file an unlawful detainer action against Macke. On February 25, 1992, Mr. Byers sent a proposed agreement to the owner's attorney stating that

Jetz would defend and indemnify the owner and pay the owner's legal costs, in connection with "the proposed unlawful detainer actions against Macke Laundry Service and any other claims, costs and liabilities arising from such actions." The letter further stated that this agreement was contingent upon the acceptance, by owner's counsel, of all of the reasonable recommendations of Jetz or Jetz's counsel concerning the pursuit of the litigation. Counsel for the owner executed the agreement on the owner's behalf.

In March, 1992, the owner filed suit for unlawful detainer as requested and directed by Mr. Byers, acting for Jetz. This action was dismissed without prejudice on the date of trial, when it was discovered that the owner had been accepting rental payments from Macke. In June, 1992, the Circuit Court of Jackson County entered summary judgment in favor of Macke in an action filed to challenge the arbitration award which had granted Macke a right of first refusal on the Fox Crossings lease.

Thereafter, on August 6, 1996, the owners refiled the unlawful detainer actions against Macke in the Circuit Court of Platte County, Associate Division. Prior to this filing of the petitions, Jetz agreed that it would continue to pay the legal fees and costs of the unlawful detainer actions. Counsel for the owner also met with Mr. Byers prior to the filing of the petition, and Mr. Byers "approved of" the filing of the actions. The unlawful detainer petitions were denied and Macke's right to continue leasing the premises was upheld. In its judgment on the consolidated cases for Macke, the trial court found that the actions were frivolous and without merit.

### Broadway Village

On September 10, 1986, Macke entered into a five-year lease with the owner of the Broadway Village property. The lease included a provision giving Macke a right of first refusal. On November 26, 1991, the owner informed Macke of its intent to exercise the cancellation provision of its lease with Macke.

On December 6, 1991, the owner entered into a five-year lease with Jetz. The Jetz lease include the thirty-six hour termination provision. On December 13, 1991, the owner sent a letter to Macke enclosing the Jetz lease, and asking for a matching lease within twenty-four hours, should Macke choose to exercise its right of first refusal.

On December 26, 1991, the owner sent a letter to Macke stating that Macke's exercise of its right of first refusal had failed to match the terms of the Jetz lease because the Jetz lease "had many significant differences in terms and conditions." In a subsequent memo from Mr. Byers to the owner's attorney, Mr. Byers stated that there were substantial differences between the Macke and Jetz leases with respect to "the amount of insurance to be provided, lessee's right to adjust lease payments, an arbitration clause, and several other differences." The owner demanded that Macke vacate the premises, and Macke obtained arbitration of the dispute. The ensuing arbitration resulted in a decision upholding Macke's continuing leasehold rights.

### Briarwood Hills

On January 6, 1987, Macke entered into a five-year lease with the owner of the Briarwood Hills property. The lease included a provision giving Macke a right of first refusal. The lease also included the following provision:

This Agreement shall automatically renew itself for successive, similar terms as the initial term unless either party gives written notice of its intention not to renew during the first month of the final year of the initial term or any renewal term. Lessee to notify lessor 30 days prior to renewal of this contract.

The first month of the final year of the initial term of the lease passed without either party giving written notice of an intention not to renew.

On February 17, 1992, the owner entered into a ten-year lease with Jetz. The Jetz lease included the thirty-six hour termination provision. On February 18, 1992, the owner sent a letter to Macke enclosing the Jetz lease, and asking for a matching lease within twenty-four hours, should Macke choose to exercise its right of first refusal. In response, Macke claimed that its own lease had automatically renewed because of the own-

er's failure to give timely notice of its intention not to renew. Consequently, argued Macke, the Jetz lease was invalid, and therefore Macke's right of first refusal was inapplicable.

Macke then made a demand for arbitration, as provided by its lease with the owner. Macke claimed that, at least thirty days before the end of the initial term, it had given the owner notice that the lease would renew. The owner denied that any such notice had been given. The arbitrator ultimately found in favor of Macke.

*Oak Rose/Sal Marco*

The facts in the record concerning the Oak Rose/Sal Marco properties are less developed than for the previous properties. The dispute at Oak Rose/Sal Marco began in the summer of 1992, when the owner removed Macke's laundry equipment from the premises, and thereafter permitted occupancy by Jetz's laundry equipment. Macke demanded that Jetz vacate the premises, but Jetz refused. Macke then sued and obtained a judgment against Jetz for wrongful detainer.

*The Present Litigation*

On July 13, 1994, Macke filed a third amended petition for damages against Jetz; Timothy Etzel and Donald Sommers, who were the president and local manager of Jetz, respectively; and Mr. Byers and Newhouse, Byers & Swaney, who provided legal representation to Jetz. Each of the first four counts of the petition alleged tortious interference with a contract or contract expectancy at a different apartment complex.

Count One alleged that Jetz induced the owner of Fox Crossing to reject Macke's exercise of its right of first refusal so that Jetz could install its own machines on the premises. Count One further alleged that Jetz induced the owner to pursue litigation in an attempt to force Macke off the premises, and that Macke was required to incur legal fees and expenses in order to maintain its leasehold rights.

Count Two alleged that Jetz induced the owner of Briarwood to demand that Macke vacate the premises when Macke's renewable lease with the owner expired. Count Two further alleged that Macke was required to incur legal fees and expenses in order to enforce the renewal of its lease.

Count Three alleged that Jetz induced the owner of Broadway Village to reject Macke's exercise of its right of first refusal. Count Three further alleged that Macke was required to incur legal fees and expenses in order to maintain its leasehold rights.

Count Four alleged that Jetz induced the owner of Oak Rose/Sal Marco to remove Macke's laundry machines from the premises, and to permit Jetz to install its machines in their place. Count Four further alleged that Macke was required to incur legal fees and expenses in order to pursue an unlawful detainer action which resulted in a judgment against Jetz.

Count Five alleged that Jetz entered into an agreement with the owners of the Fox Crossing, Briarwood, and Broadway Village properties to finance and direct the litigation and arbitration conducted by the owners in their disputes with Macke, and to indemnify the owners for any damages or expenses arising from their disputes with Macke. Count Five further alleged that Jetz did not have a legitimate or legally enforceable interest in these disputes, and that its actions constituted the torts of champerty and maintenance of litigation.

Count Six alleged that Mr. Byers and Newhouse, Byers, and Swaney conspired with the other defendants to carry out the torts of interference with contract rights and expectancies, champerty and maintenance of litigation alleged in Counts One through Five. Count Six further alleged that the conspiracy also involved interference with a contract entitling Macke to the exclusive use of the laundry rooms at the Heritage Hills Apartments in Johnson County, Kansas.[2]

Count Seven concerned the unlawful detainer actions filed on August 6, 1992 against

**2.** On May 6, 1994, shortly before this petition was filed, the Kansas Court of Appeals held that Jetz had not tortiously interfered with Macke's contractual relationship with the owner of the Heritage Hills Apartments. *Macke Laundry v. Mission Associates*, 19 Kan.App.2d 553, 873 P.2d 219, 225–26 (1994).

Macke by the owner of the Fox Crossing property. Count Seven alleged that these actions were instigated by Jetz pursuant to an agreement between Jetz and the property owner whereby Jetz undertook to finance and direct any litigation conducted by the property owner against Macke. Count Seven alleged that the detainer actions were frivolous and wholly without merit, and sought damages from Jetz on the theory of malicious prosecution.

On January 30, 1995, Mr. Byers and Newhouse, Byers & Swaney filed a motion for summary judgment. The movants contended that they were entitled to judgment as a matter of law on Count Six, which they asserted was the only count which applied to them. The movants argued that they could not be found liable on the basis of a civil conspiracy to commit tortious interference with contracts, champerty, or maintenance because the uncontroverted facts in the record showed that the attorneys were not acting for their own personal benefit, and that neither Mr. Byers nor Newhouse, Byers & Swaney paid the attorney fees of any third party.

At some point between the filing of the motion for summary judgment and the trial court's ruling on the motion, Jetz, Mr. Etzel, and Mr. Sommers settled with Macke, leaving Mr. Byers and his law firm as the only remaining defendants. On March 6, 1995, the trial court ruled on the motion, granting summary judgment on behalf of Mr. Byers and his law firm.

In its sole point on appeal, Macke claims that the trial court erroneously declared the law in its holding that an attorney is immune from liability for civil conspiracy with the attorney's client unless the attorney could be held individually liable for the underlying tort, and unless the attorney was acting for the attorney's own personal benefit.

On appeal from a summary judgment, an appellate court determines whether there is any genuine issue of material fact left unresolved in the record before the trial court, and whether the party to whom judgment was granted was entitled to judgment as a matter of law. *Thurston v. Ballinger,* 884 S.W.2d 22, 23 (Mo.App.1994). Appellate review of a summary judgment is essentially *de novo,* by which the appellate court tests the propriety of the summary judgment by the same standards as those employed by the trial court. *Dana Commercial Credit Corp. v. Cukjati,* 880 S.W.2d 612, 614–15 (Mo.App. 1994).

In order to recover on a claim of civil conspiracy, the plaintiff must prove (1) an agreement or understanding; (2) between two or more people; (3) to do an unlawful act, or to do a lawful act by unlawful means. *Kansas City DMDC v. Corrigan Associates,* 868 S.W.2d 210, 222 (Mo.App.1994). Typically, civil conspiracy is not itself actionable; "some wrongful act must have been done by one or more of the alleged conspirators and the fact of a conspiracy merely bears on the liability of the various defendants as joint tortfeasors." *Bockover v. Stemmerman,* 708 S.W.2d 179, 182 (Mo.App.1986).

Macke first claims that, in its December 6, 1994 ruling on Macke's motion to compel disclosure of privileged communications, the trial court found that Macke's evidence established a prima facie showing that Mr. Byers and the other conspirators had committed one or more of the torts alleged. Macke argues that the order of December 6, 1994 established, as the "law of the case," that Macke had presented facts independent of Macke's pleadings which established a prima facie case of a conspiracy to commit at least one of the torts alleged. Macke claims that the order of December 6, 1994 constitutes a conclusive ruling as to the issues presented and governs further prosecution of the case. Therefore, Macke argues that the trial court could not have found for Mr. Byers and his law firm on their motion for summary judgment.

Macke is correct that the trial court's grant of summary judgment in favor of Mr. Byers and his law firm is inherently in conflict with its prior finding that Macke's evidence made a prima facie case for conspiracy to commit at least one of the torts pled. This fact does not entitle Macke to relief. Macke's "law of the case" argument is based on the inaccurate premise that an interlocutory order of the trial court is binding on the

court, unless the trial court expressly sustains a motion to vacate or modify the order. This is contrary to the nature of both the doctrine of "law of the case" and interlocutory orders.

The "law of the case" doctrine provides that a decision of an appellate court is binding on both the trial and appellate courts in subsequent proceedings, so long as the facts in the subsequent proceeding are substantially similar. *State ex rel. Mercantile Nat. Bank at Dallas v. Rooney*, 402 S.W.2d 354, 361 (Mo. banc 1966). *See also Student Loan Marketing Ass'n v. Raja*, 914 S.W.2d 825, 829 (Mo.App.1996). An interlocutory order may be reconsidered, amended, reversed or vacated by the trial court at any time prior to final judgment being entered. *Blake v. Irwin*, 913 S.W.2d 923, 934 (Mo.App. 1996). A trial court is in no way bound by a prior ruling in an ongoing proceeding as the "law of the case."

Macke next argues that the trial court erred in granting summary judgment on its claim in Count Six that Mr. Byers, as attorney for Jetz, conspired with Jetz, its president, and its local manager to commit the torts of tortious interference with a contract or contract expectancy, champerty and maintenance of litigation, and malicious prosecution. The analysis of Macke's assertion of error must go beyond consideration of whether Macke has presented evidence which raises a genuine issue of fact concerning one or more of the elements of a cause of action for conspiracy, because the nature of the attorney-client relationship between Mr. Byers and Jetz impacts Mr. Byers' liability to a nonclient for acts occurring during his representation of Jetz. Although there are no Missouri cases which outline the circumstances under which an attorney is liable for conspiracy, there is clear direction from Missouri law governing attorney liability and principal-agency relationships, as well as from the law of other jurisdictions.

The attorney-client relationship is one of agency. *Sappington v. Miller*, 821 S.W.2d 901, 904 (Mo.App.1992). As an agent of the client, an attorney acts as the client's alter ego and not for the attorney personally. *McLaughlin v. McLaughlin*, 427 S.W.2d 767,

768 (Mo.App.1968). Although an attorney may act as the client's agent, the converse is not true. Ronald E. Mallen and Jeffrey M. Smith, *Legal Malpractice*, § 6.8 at 415 (4th ed.1996). A client is not the attorney's agent. Id. In addition, an identity between agent and principal leads to a legal impossibility in the context of conspiracy. Two entities which are not legally distinct cannot conspire with one another. *Metts v. Clark Oil & Refining Corp.*, 618 S.W.2d 698, 702 (Mo.App.1981).

Therefore, the client's misconduct cannot be imputed to the attorney. *Henderson v. Cape Trading Co.*, 316 Mo. 384, 289 S.W. 332, 335 (1926). This is consistent with the general rule that wrongs which are attributed to an attorney as the client's agent do not support a conspiracy. Mallen and Smith, § 6.4 at 403. *See also Astarte, Inc. v. Pacific Indus. Systems, Inc.*, 865 F.Supp. 693, 708 (D.Colo.1994); *Skarbrevik v. Cohen, England & Whitfield*, 231 Cal.App.3d 692, 709, 282 Cal.Rptr. 627, 638–39 (2 Dist.1991); *Salaymeh v. InterQual, Inc.*, 155 Ill.App.3d 1040, 108 Ill.Dec. 578, 581–82, 508 N.E.2d 1155, 1158–59 (1987); *Fraidin v. Weitzman*, 93 Md.App. 168, 611 A.2d 1046, 1079 (1992).

That is not to say that an attorney, as an agent, can never be held liable for conspiracy with a client, the attorney's principal. Under general agency law, an agent can be liable for conspiracy with the principal if the agent acts out of a self-interest which goes beyond the agency relationship. *Metts*, 618 S.W.2d at 702. *See also Byers Bros. Real Estate & Ins. Agency, Inc. v. Campbell*, 329 S.W.2d 393, 397 (Mo.App.1959) (real estate agent liable as a co-conspirator under facts demonstrating that agent was acting for own personal benefit). In addition, an attorney may be liable even though the attorney is acting within the scope of the attorney-client relationship, under the general principles of law governing attorney liability.

Traditionally, an attorney's liability for the attorney's professional acts has been governed by the concept of privity, and an attorney is usually not liable for an injury to a nonclient arising out of the representation

of a client. Mallen and Smith, § 6.1 at 396. *See also Donahue v. Shughart, Thompson & Kilroy, P.C.,* 900 S.W.2d 624, 627 (Mo. banc 1995). Nevertheless, the Missouri Supreme Court, in *Stafford v. Muster,* 582 S.W.2d 670, 679 n. 5 (Mo.banc 1979), noted that there has been a long history in Missouri of holding an attorney liable to third parties in malicious prosecution and false imprisonment actions. *See Henderson,* 289 S.W. at 334–36 (malicious prosecution); *Peck v. Chouteau,* 91 Mo. 138, 3 S.W. 577, 581 (1887) (malicious prosecution); *Tiede v. Fuhr,* 264 Mo. 622, 175 S.W. 910 (1915) (false imprisonment). The Court, in *Stafford,* following the historical precedent of malicious prosecution and false imprisonment cases, and what it described as the uniform law of American jurisdictions, ruled that there was also a cause of action against an attorney for abuse of process. *Stafford,* 582 S.W.2d at 679.

In finding attorneys liable to third parties in these limited causes of action, the Supreme Court did not articulate a rule which would provide guidance as to whether liability would also arise in other causes of action. Recently, however, the Supreme Court has provided direction in addressing this issue. In *Donahue,* 900 S.W.2d at 627, the Supreme Court recognized the "exceptional circumstances" rule, which had been previously utilized by the intermediate appellate courts, as a basis for determining the circumstances under which an attorney will be held liable to third parties.

■ The "exceptional circumstances" rule was originally derived from 6 C.J., *Attorney and Client,* § 114 (1916). *White v. McCoy Land Co.,* 101 S.W.2d 763, 766 (Mo.App. 1936), *aff'd White v. Scarritt,* 341 Mo. 1004, 111 S.W.2d 18 (1937). This rule provides that an attorney may be liable to a third person for acts arising out of the attorney's representation of a client, if the attorney is guilty of "fraud, collusion, or a malicious or tortious act." *Donahue,* 900 S.W.2d at 627. *See also Rose v. Summers, Compton, Wells & Hamburg,* 887 S.W.2d 683, 686 (Mo.App.

1994); *Kennedy v. Kennedy,* 819 S.W.2d 406, 410 (Mo.App.1991). The exceptional circumstances test appears to be a codification of the principles previously applied by Missouri courts. *See White v. McCoy Land Co.,* 101 S.W.2d at 766. A survey of Missouri cases finding attorneys liable to third parties does not reveal any case where the holding of the case was inconsistent with the result which would have been reached if the exceptional circumstances rule had been applied.

■ The basis for the exceptional circumstances rule is that "fraud, collusion, or a malicious or tortious act" is conduct which is beyond the conditional or qualified privilege of an attorney. *See Kennedy,* 819 S.W.2d at 410; *Fraidin,* 611 A.2d at 1080. According to the general common law doctrine of privilege, when a party acts from a justifiable motive, the party is allowed freedom from liability because the party's own interests, or those of the public, require it and because social policy will be best served by permitting it. *Prosser and Keeton on the Law of Torts,* § 16 at 109 (5th ed.1984). The rationale for the privilege granted to an attorney representing a client is the attorney's fiduciary duty to the client, and the public policy that attorneys be able to discharge that duty by freely using those procedures that are necessary to competently represent their clients unfettered by fear of personal liability. Mallen and Smith, § 20.8 at 671–72. The nature of the privilege granted to an attorney will be discussed in detail *infra.*

The exceptional circumstances rule has been applied to determine an attorney's liability in two cases.[3] In *White v. McCoy Land Co.,* 101 S.W.2d at 766, an attorney, who was guilty of fraudulent acts and representations, was held liable for instituting a suit when the attorney knew his client's claim had no merit and that the suit was being instituted in bad faith for the purpose of compelling payment from the defendant. The exceptional circumstances rule was also utilized in *Kennedy,* 819 S.W.2d at 410, to

**3.** The courts of other jurisdictions have been called upon to consider the exceptional circumstances rule in the context of claims for fraud, malicious prosecution, abuse of process, false arrest or imprisonment, interference with an ad-

vantageous relationship, intentional infliction of mental distress, invasion of privacy, defamation and other theories. Mallen and Smith, § 6.1 at 396–97 (citations omitted).

find that the nonclient plaintiffs stated a cause of action for tortious interference with a business relationship and slander of title where the plaintiffs pled that the attorney maliciously published false representations which the attorney knew or should have known were false.

Although the rule states that an attorney may be liable to a nonclient when the attorney has committed a "tortious act," not all tortious conduct is encompassed by the rule. The rule is limited to intentional torts. *Mark Twain Kansas City v. Jackson*, 912 S.W.2d 536, 538 (Mo.App.1995). Specifically, the Eastern District of this court has held that the tort of legal malpractice does not qualify as an exceptional circumstance for purposes of the rule. *Rose*, 887 S.W.2d at 686.

The application of agency conspiracy law and the principles governing an attorney's liability to determine when an attorney may be liable for conspiring with the attorney's client is consistent with the case law of other jurisdictions. Other jurisdictions have held that an attorney may incur liability when the attorney acts for the attorney's sole personal benefit, rather than for the benefit of the attorney's client,[4] *Worldwide Marine Trading v. Marine Transport Serv.*, 527 F.Supp. 581, 583 (E.D.Pa.1981); *Skarbrevik*, 231 Cal. App.3d at 710–11, 282 Cal.Rptr. at 639; *Fraidin*, 611 A.2d at 1080; *Williams v. Grand Lodge of Freemasonry*, 355 N.W.2d 477, 480 (Minn.App.1984); *Stiles v. Onorato*, 457 S.E.2d 601, 602 (S.C.1995); when the acts of the attorney rise to the level of active participation in a fraud, *Astarte*, 865 F.Supp. at 708; *Skarbrevik*, 231 Cal.App.3d at 711, 282 Cal.Rptr. at 640; *Likover v. Sunflower Terrace II, Ltd.*, 696 S.W.2d 468, 472 (Tex. App.1985); and when the attorney acts with actual malice or a desire to harm. *Fraidin*, 611 A.2d at 1080; *Salaymeh*, 108 Ill.Dec. at 583, 508 N.E.2d at 1160. At least two jurisdictions have also recognized an additional basis on which an attorney can be liable for

conspiracy with a client, that being when the attorney owes an independent duty to the plaintiff.[5] *Skarbrevik*, 231 Cal.App.3d at 710, 282 Cal.Rptr. at 639; *Stiles*, 457 S.E.2d at 602.

Pursuant to existing Missouri precedent, and in conformity with the case law from other jurisdictions cited *supra*, an attorney's conduct may expose the attorney to liability for conspiring with a client when the attorney acts outside the scope of the attorney-client relationship. This occurs when the attorney has an independent personal stake in achieving the object of the conspiracy. Even when an attorney is acting within the scope of representing the client, the attorney may be liable under the exceptional circumstances rule if the attorney is guilty of fraud, collusion, or a malicious or tortious act.

Having determined the governing principles to be applied, it remains for this court to apply the law in the context of the trial court's ruling on Mr. Byers and his law firm's motion for summary judgment. Pursuant to *ITT*, 854 S.W.2d at 381, a defending party may establish a right to summary judgment by showing facts that negate any one of the elements of the plaintiff's cause of action, or by showing that the plaintiff, after an adequate period of discovery, has not been able to produce, and will not be able to produce, evidence sufficient to allow the trier of fact to find the existence of any one of the elements of the plaintiff's cause of action. Once the defending party has made such a showing, the burden shifts to the plaintiff, who must demonstrate by affidavit, depositions, answers to interrogatories or admissions on file that one or more of the material facts relied upon by the defending party is genuinely disputed. *Id.*

Paragraph no. 3 of the motion for summary judgment filed by Mr. Byers and his law firm asserts that in Macke's claim for conspiracy there is no allegation by Macke that Mr. Byers acted for his own personal

---

4. The fact that the attorney has been or will be paid legal fees for representation of the attorney's client does not meet this standard. *See Skarbrevik*, 231 Cal.App.3d at 711, 282 Cal.Rptr. at 639.

5. Macke does not allege that Mr. Byers owed it a duty, so it is not an issue here whether an attorney's independent duty to a third party creates liability under Missouri law.

benefit, and the motion's supporting documentation includes deposition testimony by Macke's local manager that she had no information which would lead her to conclude that Mr. Byers had a personal, as opposed to a professional, interest in regard to the disputed properties. In response, Macke makes no showing of a genuine issue of material fact with respect to this issue. In fact, Macke admits paragraph no. 3, but deems it irrelevant. We find it very relevant, for it means that Mr. Byers and his law firm are not liable for his client's misconduct and malice under the theory of conspiracy. *Metts,* 618 S.W.2d at 702; *Byers Bros. Real Estate & Ins. Agency, Inc.,* 329 S.W.2d at 397.

■ As a result, the only basis for liability to Macke is if the exceptional circumstances rule is applicable and Mr. Byers, not his client, committed fraud, collusion, or a malicious or tortious act. In considering the exceptional circumstances rule, Macke's petition does not allege fraud or collusion.[6] If Macke is to recover, then it must be upon the basis that Mr. Byers is guilty of a malicious or tortious act. It is necessary then to examine each tort pled by Macke and the evidence of Mr. Byers' conduct applicable thereto.

■ Macke's Count Six expressly asserts claims on the basis of the torts of tortious interference, champerty and maintenance of litigation. Count Six does not allege that Mr. Byers or his law firm is liable for the tort of malicious prosecution. The only count to expressly state a claim for malicious prosecution is Count Seven, and that count does not include Mr. Byers or his law firm as defendants. Nor is Count Seven incorporated by reference into Count Six, which is the only count to include Mr. Byers or his law firm as defendants.

■ Consequently, Mr. Byers and his law firm contend in their brief that Macke has failed to state a cause of action against them for the tort of malicious prosecution. It is true that Count Six does not expressly state such a claim. But, as Macke argued in its response to the motion for summary judgment, Count Six does expressly incorporate all of the preceding paragraphs in the petition, and it is the factual allegations in the petition, not the form of the petition, which are to be considered in determining a plaintiff's theory. *Alarcon v. Dickerson,* 719 S.W.2d 458, 461 (Mo.App.1986). The facts alleged in the petition up through Count Six are sufficient to state a claim against Mr. Byers and his law firm for malicious prosecution.

■ To prove Mr. Byers liable of malicious prosecution, an intentional tort, Macke must have made a showing of: (1) commencement of an earlier suit against Macke; (2) instigation of the suit by Mr. Byers; (3) termination of the suit in Macke's favor; (4) lack of probable cause for the suit; (5) the presence of malice on the part of Mr. Byers; and (6) damage to Macke resulting from the suit. *State ex rel. Police Ret. Sys. v. Mummert,* 875 S.W.2d 553, 555 (Mo. banc 1994).

■ The trial court did not err in granting the motion for summary judgment on Macke's claim of malicious prosecution because Macke has failed to make a showing of malice on the part of Mr. Byers. The malice required to support a malicious prosecution action against an attorney differs from the malice required on the part of non-attorney defendant. In *Henderson,* 289 S.W. at 334–36, the Missouri Supreme Court held that the test to establish malice on the part of an

---

**6.** Inclusion of the term "collusion" in the exceptional circumstances rule does not significantly expand the scope of the rule. The legal meaning of the term "collusion" is "a secret concert of action between two or more for the promotion of some fraudulent purpose." *Weaver v. Schaaf,* 520 S.W.2d 58, 66 (Mo. banc 1975) (quoting *W. E. Bowen Improvement Co. v. Van Hafften,* 209 Mo.App. 629, 238 S.W. 147, 149 (1922)). Collusion is also defined as "an agreement between two or more persons to defraud another under the forms of law, or to accomplish an illegal purpose." *Weaver,* 520 S.W.2d at 66 (quoting *Colegrove v. John Hancock Mut. Life Ins. Co.,* 153 S.W.2d 750, 752 (Mo.App.1941)). The term "collusion" requires fraud or an "illegal purpose," matters already included in the rule by the terms "fraud" and "malicious or tortious act."

The term "collusion" should not be interpreted to be synonymous with "conspiracy" whereby an attorney would be liable for all conspiracies, because the exceptional circumstances rule coexists with the general rule that the client's misconduct and malice cannot be imputed to the attorney. *See Fraidin,* 611 A.2d at 1079–80.

attorney depends on whether the attorney acted upon a statement of facts provided by the client, or whether the attorney obtained the information acted upon. Earlier, in *Peck*, 3 S.W. at 581, the Supreme Court held that in order to show malice on the part of the attorney, where the attorney acted solely upon the facts related by the client, (1) the attorney must have known that there was no probable cause for the prosecution; and (2) the attorney must have known that the client was acting solely through improper motives. *Henderson* 289 S.W. at 335.

■ *Henderson,* however, dealt with a situation where the attorney had not relied upon information from the client. *Id.* The Court held that, under those circumstances, malice is proven if (1) the attorney knew that there is no probable cause for the prosecution; and (2) the attorney was acting through improper motives. *Id.* 289 S.W. at 335–36.[7] Attorneys who act after their own investigation are not liable for malicious prosecution if their acts are performed "in good faith and have the honest purpose of protecting the interests of [the attorney's] client." *Id.* 289 S.W. at 335.

■ The definition of malice, i.e., improper motives, pertaining to the circumstances of *Henderson,* is, in effect, a requirement that there must be a showing of legal malice. *See Proctor v. Stevens Employment Services, Inc.,* 712 S.W.2d 684, 686 (Mo. banc 1986). This is in contrast to the standard for malice in an action for civil malicious prosecution against a non-attorney defendant, which requires a showing of malice in law. *Id.* at 686–87. This is significant because, unlike malice in law, legal malice cannot be inferred from the facts which establish a lack of probable cause. *See id.* at 687.

■ "An act intentionally done without the honest belief that it was lawful when done ..." is malice in law, *Ball v. American Greetings Corp.,* 752 S.W.2d 814, 822 (Mo. App.1988), and is insufficient to prove malicious prosecution by an attorney acting in representation of a client. Macke must prove instead, by direct or indirect evidence, that "the proceedings must have been initiated or continued primarily for a purpose other than that of securing the proper adjudication of the claim on which they are based." *Proctor,* 712 S.W.2d at 687.

There is no evidence in the record showing legal malice on the part of Mr. Byers in connection with the filing of the second unlawful detainer actions. Macke claims that Mr. Byers' malice is shown by the fact that the litigation was undertaken "in bad faith," which was proven by the judgment for Macke in the unlawful detainer actions which found that the actions were frivolous and without merit. Even if Mr. Byers instigated the filing of the unlawful detainer suits when there was no probable cause, there was no evidence that his acts were for a purpose other than to secure the proper adjudication of the claims. The trial court did not err in granting summary judgment on Macke's claim of malicious prosecution.

■ We next consider Macke's claim that Mr. Byers is liable for tortious interference with a business relationship, an intentional tort. To survive the motion for summary judgment, Macke must not only have pled, but have produced evidence that: (1) Macke had a valid business relationship or expectancy; (2) Mr. Byers knew of the relationship or expectancy; (3) Mr. Byers intentionally interfered in inducing or causing breach of the relationship or expectancy; (4) the absence of justification; and (5) resulting damages. *Nazeri v. Missouri Valley College,* 860 S.W.2d 303, 316 (Mo. banc 1993).

■ Macke presented evidence which, if taken in the light most favorable to Macke, would prove that Macke had a valid business relationship or expectancy, that Mr. Byers had knowledge of the relationship or expectancy and, as attorney for Jetz, Mr. Byers intentionally induced or caused a breach of the relationship or expectancy, resulting in

---

**7.** The tests for attorney malice set out in *Henderson* have elements in common with the general rule set out in Mallen and Smith, § 6.20 at 454, which states that the common-law definition of malice by an attorney is: "(1) the attorney must know that there is no probable cause for the prosecution; and (2) either the attorney acted with an improper motive or the attorney knew that the client was motivated by malice."

damage to Macke. The issue, then, is whether Macke has proffered evidence to meet its burden of proving the remaining element, lack of justification..

 "Absence of justification" is the absence of any legal right to take the actions which form the basis of the claim. *SSM Health Care, Inc. v. Deen*, 890 S.W.2d 343, 346 (Mo.App.1994). No liability arises from interfering with a contract or business expectancy, if the defendant had an unqualified legal right to do the action of which the petition complains. *Nazeri*, 860 S.W.2d at 317. The action is justified if it is privileged and not unlawful. *Hester v. Barnett*, 723 S.W.2d 544, 564 (Mo.App.1987).

 In determining whether the acts of Mr. Byers were privileged, we must examine the privilege available to relieve an attorney from liability to third parties. In *Kennedy*, 819 S.W.2d at 410, the court discussed an attorney's privilege in the context of the tort of tortious interference. The privilege there concerned defamatory statements made in connection with the attorney's representation of the client. With regard to defamatory statements, an attorney's privilege is "absolute" if the communication is related to a judicial proceeding, or "conditional and qualified," if the statements are made "bona fide in performance of a duty, or with a fair and reasonable purpose of protecting the interest of the person making them, or the interest of the person to whom they are made." [8] *Id.* A "qualified" defamation privilege is defeated if the attorney was motivated by actual malice. *Roberson v. Beeman*, 790 S.W.2d 948, 951 (Mo.App.1990).

Because this case does not involve a defamatory communication, the defamation privilege does not apply. Nevertheless, this court finds that Mr. Byers actions in representing Jetz may be privileged. The rationale for a privilege to protect attorneys when representing clients has long been recognized by the Missouri Supreme Court, which acknowledged that "[i]f attorneys cannot act and advise freely and without constant fear of being harassed by suits and actions at law, parties could not obtain their legal rights." *Peck*, 3 S.W. at 581 (quoting *Campbell v. Brown*, 2 Woods, 350).

 It is only logical that the attorney should be privileged to advise and to act for a client, even though that advice, if wrong, may cause a client to tortiously interfere with another's business relationship or expectancy. Otherwise, there is "a serious risk of interfering [with] an attorney's ability to exercise independent judgment for the client with undivided loyalty." Mallen and Smith, § 6.24 at 475. This privilege has already been recognized by Missouri courts to protect a corporate officer acting within the officer's authority, so long as the officer does not employ wrongful means and acts with good faith to protect the interests of the corporation and not for the officer's self interest. *Preferred Physicians Mut. Management Group. v. Preferred Physicians Mut. Risk Retention*, 918 S.W.2d 805, 813 (Mo.App.1996) (citing *Meyer v. Enoch*, 807 S.W.2d 156, 159 (Mo.App.1991)). *See also Nola v. Merollis Chevrolet Kansas City, Inc.*, 537 S.W.2d 627, 634 (Mo.App.1976).

 In addition, §§ 770 and 772 of the Restatement (Second) of Torts (1977) recognize analogous privileges in the area of tortious interference. Neither section is limited in its application to attorneys, but both note that the privileges granted are available to attorneys acting for clients. Section 770 relates to an actor charged with responsibility for the welfare of a third person. Section 770 protects the actor from liability when the actor causes the person for whom the actor is responsible not to perform a contract or enter into a prospective contractual relation with another, so long as the actor "does not employ wrongful means and acts to protect the welfare of the third person." Section 772 shelters a person who gives a person truthful information or honest advice, within the scope of a request for advice, from liability to one injured when that advice causes the person receiving the advice not to perform a

---

8. The privileged communication, whether absolute or qualified, is available as a defense to any defendant; its application is not limited to attorneys. *See Henry v. Halliburton*, 690 S.W.2d 775, 780 (Mo. banc 1985).

contract or enter into a prospective contractual relation.

■ This court recognizes a privilege for attorneys, when acting within the scope of the attorney-client relationship, to advise and to act for a client even though that advice, if wrong, may cause a client to tortiously interfere with another's business relationship or expectancy, so long as the attorney does not employ wrongful means and acts with good faith to protect the interests of the client and not for the attorney's self interest. "In the context of tortious interference, improper means are those that are independently wrongful, such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade, or any other wrongful act recognized by statute or common law." *Nazeri*, 860 S.W.2d at 317.

So long as Mr. Byers's conduct in representing Jetz brings him within the privilege, the exceptional circumstances rule will not apply to make him liable to a third party such as Macke. Therefore, in order to prove that Mr. Byers is not privileged, Macke must prove that Mr. Byers utilized threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade, or any other wrongful act recognized by statute or common law; was not acting in good faith for the interest of his client; or was motivated by self interest. In response to the motion for summary judgment, Macke failed to produce evidence which would demonstrate the use of improper means or that Mr. Byers acted out of self-interest and not in good faith to protect Jetz's interest.

Macke argues that it has evidence of bad faith in Mr. Byers' remark of "Maybe our trap will work" on the transmittal page of a fax from Mr. Byers to Jetz in reference to the inclusion in the lease of the thirty-six hour termination clause. Although the use of the word "trap" implies a furtive plan, the drafting of the thirty-six hour termination clause for insertion into the lease agreements was not the use of improper means. Nor does it demonstrate that Mr. Byers was not acting in good faith to protect Jetz' interest, as protecting or promoting Jetz' interest was the only motive supported by the evidence. Therefore, the trial court did not err in

granting summary judgment in favor of Mr. Byers and his law firm on Macke's claim that Mr. Byers conspired to tortiously interfere with Macke's contracts or business expectancies.

Macke further claims in Count Six that Mr. Byers conspired with his client to carry out the torts of champerty and maintenance of litigation, as alleged in Count Five. For liability, there must be a showing that the torts of champerty and maintenance of litigation are intentional torts within the exceptional circumstances rule, and that Mr. Byers personally committed the tortious acts pled.

■ The elements of champerty are "(1) an agreement by one with no interest in a lawsuit of another (2) to support or maintain the litigation at his own expense (3) in exchange for a part of the litigated matter in the event of a successful conclusion of the cause." *Schnabel v. Taft Broadcasting Company, Inc.*, 525 S.W.2d 819, 825 (Mo.App. 1975). Maintenance of litigation requires proof that a non-party to a suit maintains or assists either party, with money or otherwise, in prosecuting or defending the suit. *Id.* at 823. Because *Schnabel* provides a clear guide to the conduct necessary to establish the liability of an attorney to a non-client, we assume, without finding, that the exceptional circumstances rule applies to the torts of the champerty and maintenance of litigation.

■ In *Schnabel*, the plaintiff filed a claim that an executive vice-president of a broadcast company, the managers of radio and television stations owned by the broadcast company, and the attorney representing an employee of the broadcast company conspired to enter into a champertous agreement on behalf of the broadcast company. *Id.* at 823–24. Consistent with the general rule that the wrongs of a client cannot be imputed to an attorney, the court in *Schnabel* affirmed the trial court's dismissal of the plaintiff's claim against the attorney because there was no allegation that the attorney personally agreed to support the litigation in return for a share of the "subject matter of the suit, if successful." *Id.* at 825.

Here, there was no evidence offered by Macke, in response to the motion for sum-

mary judgment, to prove that Mr. Byers undertook to pay or protect the owners of the Fox Crossing, Briarwood, and Broadway Village properties from the costs or expenses of litigation. Nor does Macke allege or present evidence that there was an agreement that Mr. Byers would personally receive a part of the litigated matter, if successful. In addition, there was no evidence that Mr. Byers, in fact, maintained or assisted the suit. Therefore, the grant of summary judgment in favor of Mr. Byers and his law firm on Macke's claim of conspiracy to commit champerty and maintenance of litigation was proper. Point denied.

After Macke filed its appeal with this court, Mr. Byers and Newhouse, Byers & Swaney filed a motion seeking damages and the dismissal of the appeal on the ground that the appeal is frivolous. "An appeal is frivolous if it presents no justiciable question and is so recognizably void of merit on the face of the record that there is little prospect that it can succeed." *White v. Land Clearance for Redev. Auth.,* 841 S.W.2d 691, 697 (Mo.App.1992). This court cannot conclude that the present appeal is frivolous. Motion denied.

The judgment of the trial court is affirmed.

All concur.