UNARCO MATERIAL
HANDLING, INC.

v.

William LIBERATO et al.

Court of Appeals of Tennessee,
Middle Section, at Nashville.

Jan. 5, 2010 Session.

March 2, 2010.

Published pursuant to R. 11, Tennessee
Court of Appeals.

L. Wearen Hughes, Overton Thompson III and Joshua R. Denton, Nashville, Tennessee, for the appellant, Unarco Material Handling, Inc.

Darrell G. Townsend and Neil M. McIntire, Nashville, Tennessee, for the appellees, William Liberato, Kerry Steel, Inc., Kerry Nagle and Steven Z. Cohen.

## OPINION

FRANK G. CLEMENT, JR., J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and ANDY D. BENNETT, J., joined.

The issue on appeal is whether an attorney, while acting in the course of representation of his client when litigation was not pending, has immunity from a claim that he induced the former president of the plaintiff to breach a confidentiality agreement by disclosing confidential information in violation of the agreement. It is undisputed that the attorney negotiated and/or drafted an agreement whereby his client would indemnify the plaintiff's former president if information he provided in a sworn statement taken by the attorney constituted a breach of the confidentiality agreement. The trial court summarily dismissed the claim against the attorney upon the finding that the attorney was immune, even though litigation was not pending when the alleged inducement to breach the contract occurred, because the attorney was acting in his capacity as an attorney for his client. Although litigation was not pending when the attorney negotiated and/or drafted the indemnification agreement and when the attorney took the sworn statement, we find the attorney is immune under the litigation privilege because the attorney was acting in the capacity of counsel for his client, the attorney was acting in good faith for the benefit of his client and not acting for his own self-interest, the conduct was related to the subject matter of the contemplated litigation, and there was a real nexus between the attorney's conduct and the contemplated litigation. We, therefore, affirm the summary dismissal of the claim against the attorney for inducement of breach of contract.

This civil action rises from the ashes of a defunct business relationship between two companies. The two companies are Kerry Steel, Inc., a Michigan corporation, that provides steel to its commercial customers, and Unarco Material Handling, Inc., in Springfield, Tennessee, which is in the business of the manufacture, sale, and distribution of various materials including

material handling equipment, warehouse storage racks, pallet racks, retail store fixtures, and accessories.

Kerry Steel sold steel products to Unarco for years; however, that relationship became strained due to a dispute concerning Unarco's financial obligations to Kerry Steel. Thereafter, Kerry Steel filed suit in Michigan. The suit was dismissed when a settlement agreement was reached between the parties.

William Liberato was the president of Unarco during the litigation with Kerry Steel and the negotiations that resulted in the settlement with Kerry Steel. Liberato resigned from Unarco in 2005 following the settlement of the litigation with Kerry Steel. When Liberato's employment with Unarco ended, Liberato entered into a Retirement Agreement that included far-reaching confidentiality provisions.

At some point after the settlement with Unarco, Kerry Nagle, President of Kerry Steel, became suspicious that Unarco had provided inaccurate information to induce Kerry Steel to enter into a voluntary settlement. Nagle discussed his belief with Steven Z. Cohen, the attorney for Kerry Steel, and they decided to make inquiries. Knowing that Liberato was no longer employed by Unarco, they asked Liberato to provide a sworn statement concerning the negotiations and settlement. Liberato, however, was subject to the confidentiality provisions of his retirement agreement with Unarco; therefore, Liberato and his attorney had discussions with Cohen and Nagle concerning the financial ramifications to Liberato should Unarco believe his statement constituted a breach of the confidentiality provisions of the Retirement

Agreement. If it did, Liberato might forfeit the generous compensation he was to receive under the Retirement Agreement. Moreover, Liberato might be liable for Unarco's damages, if any. To resolve Liberato's concerns, and thereby induce him to give a sworn statement regarding Unarco, Cohen negotiated an indemnification agreement with Liberato, through Liberato's attorney, whereby Kerry Steel would indemnify and hold Liberato harmless from any damages that might result from his sworn statement.[1]

Pursuant to the agreement, Kerry Steel, Inc. agreed to indemnify and make Liberato whole in the event Unarco contended that Liberato's sworn statement violated the confidentiality provisions of the Retirement Agreement. On January 10, 2006, after the indemnification agreement was signed, Liberato voluntarily gave a sworn statement, in the form of an oral deposition with a court reporter, in response to questions presented by Cohen and Nagle.[2]

After learning that Liberato had provided information that Unarco believed constituted a breach of the Retirement Agreement, Unarco filed this action in the Chancery Court for Robertson County, Tennessee against four defendants, Liberato, Kerry Steel, Nagle, and Cohen. The claim against Liberato was for breach of the confidentiality provisions of the Retirement Agreement. The claims against Kerry Steel, Nagle, and Cohen were for inducing Liberato to breach his agreement with Unarco. The defendants filed answers denying liability to Unarco.

On February 29, 2008, Liberato filed a motion for summary judgment on the grounds that the Retirement Agreement

---

1. The record does not identify who drafted the indemnity agreement; however, for purposes of the summary judgment motion, we assume Cohen also helped draft the indemnification agreement.

2. Prior to the questioning, the terms of the indemnity agreement were announced.

was not breached. Kerry Steel, Nagle, and Cohen then filed motions for summary judgment on the grounds that if there was no breach of contract, then the claims against them should be dismissed. On July 7, 2008, Unarco filed a motion for partial summary judgment asserting that the undisputed facts established Liberato had breached the terms of the Retirement Agreement. Thereafter, Cohen filed a supplemental brief in support of his previous motion for summary judgment contending that even if his actions constituted an inducement of a breach of contract, he had immunity because he was acting at all times as the attorney for Kerry Steel. On October 27, 2008, Unarco filed a reply to Cohen's brief arguing that under Tennessee law no privilege applied to the facts of the case.

On December 23, 2008, the trial court granted Unarco's motion for partial summary judgment finding that Liberato had breached the confidentiality provisions of the Retirement Agreement. The trial court denied the motions of Kerry Steel and Nagle. As for Cohen, the trial court granted Cohen's motion for summary judgment finding Cohen was immune from liability to third parties for actions arising out of his professional relationship as an attorney. On January 29, 2009, Cohen moved for entry of a final judgment pursuant to Tenn. R. Civ. P. 54.02, which was granted. This appeal followed.

## Analysis

Unarco claims that Cohen induced Liberato to breach the confidentiality provisions of his agreement with Unarco for which Cohen is individually liable to Unarco. Cohen, however, contends he is immune from any claims by Unarco, based upon the litigation privilege, for he was acting in the capacity as an attorney.

Thus, Cohen contends he is entitled to summary judgment as a matter of law.

To be entitled to summary judgment, Cohen, as the moving party, must affirmatively negate an essential element of Unarco's claim or show that Unarco, as the nonmoving party, cannot prove an essential element of its claim at trial. *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 83 (Tenn.2008). Cohen also bears the burden of demonstrating that no genuine disputes of material fact exist and that he is entitled to judgment as a matter of law. *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn.2002).

The material facts in this case are not in dispute for it is undisputed that Cohen knew Liberato had an agreement with Unarco prohibiting him from disclosing Unarco's confidential information when Cohen negotiated the indemnification agreement and when Cohen questioned Liberato. It is also undisputed that, at all times material to this action, Cohen was functioning in the capacity as attorney for Kerry Steel, and that Kerry Steel was seriously considering a civil action against Unarco, though litigation was not pending when Cohen engaged in the activities at issue.

Whether Cohen's actions are protected by the litigation privilege and he is entitled to immunity constitutes a question of law and a trial court's determination of a question of law is not entitled to Tenn. R.App. P. 13(d)'s presumption of correctness on appeal. Accordingly, we will review this issue pursuant to the de novo standard of review and reach our own conclusion. *Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827, 836 (Tenn.2008); *King v. Pope*, 91 S.W.3d 314, 318 (Tenn.2002).

### Cohen's Role as Attorney for Kerry Steel Company, Inc.

While acting as the attorney for Kerry Steel Inc., Cohen performed three primary functions: (1) providing advice to his

client, (2) negotiating and drafting the indemnity agreement, and (3) questioning Liberato during the taking of his sworn statement. Unarco does not contend that the advice Cohen gave his clients was actionable. Therefore, the issue is whether Cohen's conduct, negotiating the indemnity agreement and questioning Liberato during the sworn statement taken on behalf of his client, is privileged conduct, which affords him immunity from liability to Unarco.

### THE LITIGATION PRIVILEGE

The litigation privilege arises out of the common law. It was first recognized in England in 1591 in *Buckley v. Wood,* (1591) 76 Eng. Rep. 888 (K.B.).[3] Most jurisdictions have now adopted the litigation privilege. *Finkelstein, Thompson & Loughran v. Hemispherx Biopharma, Inc.,* 774 A.2d 332, 338 (D.C.Ct.App.2001). Tennessee has recognized the litigation privilege since 1856. *See Simpson Strong–Tie Company, Inc. v. Stewart,* 232 S.W.3d 18, 22 (Tenn.2007) (citing *Lea v. White,* 36 Tenn. (4 Sneed) 111 (1856)). When first recognized in Tennessee, the litigation privilege only pertained to matters that occurred in "the course of a judicial proceeding." *Lea,* 36 Tenn. at 113–14 (finding the privilege was based upon the recognition that "'proceedings connected with the judicature of the country are so important to the public good.'") (quoting Cooke on Defamation, 49).

Courts have repeatedly embraced the privilege because "access to the judicial process, freedom to institute an action, or defend, or participate therein without fear of the burden of being sued for defamation is so vital and necessary to the integrity of our judicial system that it must be made paramount." *Simpson,* 232 S.W.3d at 23 (quoting *Jones v. Trice,* 210 Tenn. 535, 360 S.W.2d 48, 51 (1962)) (holding that "defamatory statements by a judge, witness, counselor party made in the course of a judicial proceeding, if pertinent or relevant, are absolutely privileged, and this is true regardless of whether they are malicious, false, known to be false, or against a stranger to the proceeding"). *Jones,* 360 S.W.2d at 54. As a consequence, the battleground has shifted from deciding whether to adopt the litigation privilege to establishing the parameters of its application. *Id.* at 24. Our Supreme Court refers to this new focus as "defining [the] contours" of the litigation privilege. *Id.* (stating courts now focus "less on whether to adopt the privilege and more on defining its contours"). Such was the case in *Simpson.*

The defendant in *Simpson* was a law firm, which published two statements prior to the filing of an anticipated civil action against Simpson Strong–Tie Company, Inc., soliciting prospective clients for such an action. *Simpson,* 232 S.W.3d at 20. The essence of the published statement on the firm's Internet website was that the firm was "investigating the accelerated corrosion due to defectively manufactured screws and fasteners caused by pressure treated wood" in contemplation of filing a class action, and the statement identified Simpson Strong–Tie as one of the manu-

---

**3.** It was in *Buckley v. Wood,* (1591) 76 Eng. Rep. 888 (K.B.), that a plaintiff brought a defamation action after the defendant alleged in a document filed with a court that the plaintiff was "a maintainer of pirates and murderers." *See Simpson Strong–Tie, Inc. v. Stewart,* 232 S.W.3d 18, 22 (Tenn.2007). The English court found that the publication of that document was not actionable, holding that "for any matter contained in the bill that was examinable in the said Court, no action lies, although the matter is merely false, because it [the defamatory publication] was in [the] course of justice." *Id.* (quoting *Buckley,* 76 Eng. Rep. at 889).

facturers of the screws and fasteners.[4] *Id.* at 21. Believing the statement was defamatory, Simpson Strong–Tie filed a defamation action. *Id.* The defendant law firm responded to the complaint asserting it was immune from liability to its client's anticipated adversary based upon the litigation privilege. *Id.* When the appeal reached the Tennessee Supreme Court, the only issue was whether the litigation privilege encompassed "an attorney's solicitous statements made prior to the filing of a lawsuit." [5] *Id.* at 23.

At the beginning of its analysis of the issue, the Supreme Court commented it was significant that the litigation privilege was based upon the "public policy of securing to attorneys as officers of the court the utmost freedom in their efforts to secure justice for their clients." *Id.* at 24 (quoting Restatement (Second) of Torts § 586 cmt. a. (1977)).[6] The Court further noted that "access to the judicial process, freedom to institute an action, or defend, or participate therein without fear of the burden of being sued for defamation is so vital and necessary to the integrity of our judicial system that it must be made paramount." *Id.* at 23 (quoting *Jones,* 360 S.W.2d at 51); *see also Lambdin Funeral Serv. Inc. v. Griffith,* 559 S.W.2d 791, 792 (Tenn.1978).

Having identified the public policy to be served by the privilege, the Court then turned its focus to determining whether the privilege encompassed statements—communications—made by an attorney *prior* to the commencement of an action to which the subject matter of statement pertained. *Id.* at 24. Following an analysis of the privilege as applied in Tennessee and other jurisdictions, the Court concluded that the litigation privileged applied if:

> (1) the communication was made by an attorney acting in the capacity of counsel, (2) the communication was related to the subject matter of the proposed litigation, (3) the proposed proceeding must be under serious consideration by the attorney acting in good faith, and (4) the attorney must have a client or identifiable prospective client at the time the communication is published.

*Id.* The Court also stated there must be a "reasonable nexus between the publication in question and the litigation under consideration" for the privilege to apply. *Id.*

The ruling in *Simpson* makes it clear that the privilege has been expanded beyond the former boundary of "pending litigation." Now, at least in the context of a defamation action, which pertains to communication as distinguished from conduct,

---

**4.** The statement appeared in a newspaper advertisement and the Internet website of the defendant law firm. *Simpson,* 232 S.W.3d at 21. The advertisement in *The Tennessean* stated:

ATTENTION:
WOOD DECK OWNERS
If your deck was built after January 1, 2004 with galvanized screws manufactured by Phillips Fastener Products, Simpson Strong–Tie or Grip–Rite, you may have certain legal rights and be entitled to monetary compensation, and repair or replacement of your deck. Please call if you would like an attorney to investigate whether you have a potential claim. (The contact information in the advertisement is omitted).

*Id.*

**5.** The Court was asked to answer the certified question from the federal district court. *Simpson,* 232 S.W.3d at 23.

**6.** Section 586 of the Restatement states "[a]n attorney at law is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as part of, a judicial proceeding in which he participates as counsel, if it has some relation to the proceeding." Restatement (Second) of Torts § 586.

the privilege encompasses the publication of a statement by an attorney that is related to the subject matter of proposed litigation, which is under serious consideration by the attorney acting in good faith, provided the attorney has a client or identifiable prospective client at the time the communication is published and there is a reasonable nexus between the publication in question and the litigation under consideration.

The matters at issue here, however, do not pertain to communications by an attorney, as is the case in a defamation action. The issue here is conduct, specifically the tort of inducing a breach of contract. No Tennessee court has ruled on this issue in the context of the litigation privilege, though courts in other jurisdictions have. Accordingly, we will look to other jurisdictions for guidance, just as the Supreme Court did in *Simpson.*

The Supreme Court of Hawaii examined the litigation privilege defense in the context of claims and facts that are substantially similar to ours in *Kahala Royal Corp. v. Goodsill Anderson Quinn & Stifel, LLP*, 113 Hawai'i 251, 151 P.3d 732 (2007). In that matter, former adversaries of the clients of the Jones Day law firm sued Jones Day and its clients for, *inter alia,* intentional interference with contractual relations, and inducing breaches of fiduciary, contractual, and other duties. *Kahala,* 151 P.3d at 742–43. In its defense of that action, Jones Day claimed immunity under the litigation privilege, contending that an attorney could not be held liable to the client's adversary on any theory other than malicious prosecution, fraud, or malice. *Id.* at 743. The plaintiffs replied insisting the litigation privilege was not available to Jones Day because it did

not apply to intentional torts, which they asserted were "outside the scope of an attorney's legitimate representation and involve conduct, not mere advice." *Id.* at 747. The plaintiffs further contended that the immunity did not apply because the conduct alleged did not occur *in* litigation. *Id.* at 748.

Noting that no appellate court in Hawaii had addressed the privilege as it pertained to conduct in the context of intentional interference with contractual relations, the Court looked to the public policies behind the litigation privilege and found they included:

> (1) promoting the candid, objective, and undistorted disclosure of evidence; (2) placing the burden of testing the evidence upon the litigants during trial; (3) avoiding the chilling effect resulting from the threat of subsequent litigation; (4) reinforcing the finality of judgments; (5) limiting collateral attacks on judgments; (6) promoting zealous advocacy; (7) discouraging abusive litigation practices; and (8) encouraging settlement.

*Id.* at 748–49 (quoting *Matsuura v. E.I. du Pont de Nemours & Co.,* 102 Hawai'i 149, 73 P.3d 687, 693 (2003)). The Court then analyzed the privilege as applied in other jurisdictions, including West Virginia, Illinois, Minnesota, Missouri, New York, and Oregon. *Id.* at 749–52. One such case was *Clark v. Druckman,* 218 W.Va. 427, 624 S.E.2d 864, 870 (2005).[7] In that matter the West Virginia Supreme Court applied the *Matsuura* principles to determine that there was "no reason to distinguish between *communications* made during the litigation process and *conduct* occurring during the litigation process." *Id.* (quoting *Clark,* 218 W.Va.

---

7. The plaintiff in *Clark* asserted claims of negligence, intentional infliction of emotional distress, tortious interference with a business relationship, and malicious prosecution against the defendant-lawyers. *Clark,* 624 S.E.2d at 866.

427, 624 S.E.2d 864, 870 (2005) [8] (emphasis in original)).

In its review of other jurisdictions the *Kahala* court found that courts in Illinois, Minnesota, Missouri, New York, and Oregon had addressed the "conduct" issue and held that "an attorney is afforded a conditional or qualified privilege when claims of [intentional interference with a contractual relationship] and [intentional interference with prospective economic advantage] are asserted against him by his client's adversary." *Kahala,* 151 P.3d at 750–52 (citing *Maness v. Star–Kist Foods, Inc.,* 7 F.3d 704, 709 (8th Cir.1993); *Schott v. Glover,* 109 Ill.App.3d 230, 64 Ill.Dec. 824, 440 N.E.2d 376 (1982); *Burger v. Brookhaven Medical Arts Bldg.,* 131 A.D.2d 622, 624, 516 N.Y.S.2d 705 (N.Y.App.Div.1987); *Reynolds v. Schrock,* 341 Or. 338, 142 P.3d 1062 (2006)). *Kahala* also noted that the qualified privilege could be removed in these jurisdictions if there was proof that the attorney was acting with actual malice, *see Schott,* 64 Ill.Dec. 824, 440 N.E.2d at 380, an intent to harm that was independent from the desire to protect the client, *see Fraidin v. Weitzman,* 93 Md.App. 168, 611 A.2d 1046, 1080 (Md.Ct. Spec.App.1992), with "bad faith, personal ill-will, malice, or a deliberate intent to harm the third party," *see Maness,* 7 F.3d at 709, or that the attorney was acting outside the scope of the lawyer-client relationship, *see Reynolds,* 142 P.3d at 1069. *Kahala,* 151 P.3d at 750–52 (citing cases from various jurisdictions).

After finding the foregoing authorities persuasive and by applying the foregoing principles, the Supreme Court of Hawaii concluded that the litigation privilege applied to the claims asserted against Jones Day, and that the plaintiffs had failed to allege that Jones Day attorneys were acting outside the scope of their attorney-client relationship or were acting with a desire to harm that was outside of their desire to protect their clients. *Id.* at 752. Therefore, Jones Day had immunity. *Id.*

Another case that has many similarities to the case at bar is *Macke Laundry Serv. Ltd. P'ship v. Jetz Serv. Co.,* 931 S.W.2d 166 (Mo.Ct.App.1996). In that matter, the Court of Appeals of Missouri addressed the issue of whether an attorney was immune from liability for civil conspiracy and tortious interference with contract rights.[9] *Id.* at 171. Missouri law provides that an attorney is generally not liable for an injury to a non-client arising out of the repre-

---

**8.** *Clark* also explained that the litigation privilege did *not* apply in all circumstances, that "exceptions to an absolute litigation privilege arising from conduct occurring during the litigation process are reasonable accommodations which preserve an attorney's duty of zealous advocacy while providing a deterrent to intentional conduct which is unrelated to legitimate litigation tactics and which harms an opposing party." *Clark,* 624 S.E.2d at 870. Therefore, in order for the conduct to fall within the scope of the privilege, the act must occur in the course of the attorney's representation of an opposing party and be related to the civil action. *Id.* at 871.

**9.** The trial court had ruled that an attorney was immune from liability for civil conspiracy

with the attorney's client unless the attorney could be held individually liable for the underlying tort, and unless the attorney was acting for the attorney's own personal benefit. *Macke,* 931 S.W.2d at 175. As for the issue of civil conspiracy, the appellate court examined the effect of the litigation immunity before addressing the issue of civil conspiracy because "the nature of the attorney-client relationship ... impacts [the attorney's] liability to a nonclient for acts occurring during his representation of [his client]." *Id.* at 176. Following its analysis, the Missouri appellate court found that "an attorney may be liable even though the attorney is acting within the scope of the attorney-client relationship, ..." *Id.*

sentation of a client [10] absent "exceptional circumstances." *Id.* at 177 (citing *Donahue v. Shughart, Thomson & Kilroy, P.C.*, 900 S.W.2d 624, 627 (Mo.1995)). Missouri's exceptional circumstances rule is based upon the fact that " 'fraud, collusion, or a malicious or tortious act' is conduct which is beyond the conditional or qualified privilege of an attorney." *Id.* (citing *Fraidin*, 611 A.2d at 1080; *Kennedy v. Kennedy*, 819 S.W.2d 406, 410 (Mo.Ct.App. 1991) ). The exceptional circumstances rule provides "that an attorney may be liable to a third person for acts arising out of the attorney's representation of a client, if the attorney is guilty of 'fraud, collusion, or a malicious or tortious act.' " [11] *Id.* (quoting *Donahue*, 900 S.W.2d at 627). The exceptional circumstances rule had previously been applied in a claim against an attorney for tortious interference with a business relationship and slander of title where "the attorney maliciously published false representations which the attorney knew or should have known were false." *Id.* (citing *Kennedy*, 819 S.W.2d at 410).[12] The Missouri court then ruled, "pursuant to existing Missouri precedent, and in conformity with the case law from other jurisdictions," that:

> [A]n attorney's conduct may expose the attorney to liability for conspiring with a client when the attorney acts outside the scope of the attorney-client relationship. This occurs when the attorney has an independent personal stake in achieving the object of the conspiracy. Even when an attorney is acting within the scope of representing the client, the attorney may be liable under the exceptional circumstances rule if the attorney is guilty of fraud, collusion, or a malicious or tortious act.

*Id.* at 178.

Having adopted the foregoing, the court in *Macke* found that the plaintiff's civil conspiracy claim against the attorney failed because there was no evidence that the attorney acted for his own personal gain. *Id.* at 178–79. The only remaining claim asserted against the attorney was tortious interference with a business relationship, which was recognized as an intentional tort, and the only basis for the attorney to be liable was pursuant to the exceptional circumstances rule, based upon whether the attorney personally had committed fraud, collusion, or a malicious or tortious act. *Id.* at 179–80. The issue was before the court on a motion for summary judgment,[13] and the court found that the plaintiff had alleged all of the elements to demonstrate that a business relationship existed, that the attorney knew of the

**10.** The court noted the "long history in Missouri" of holding an attorney liable to third parties for malicious prosecution and false imprisonment claims. *Macke*, 931 S.W.2d at 177.

**11.** In *Macke*, the court stated that the exceptional circumstances rule was derived from 6 C.J., Attorney and Client, § 114 (1916). *Macke*, 931 S.W.2d at 177.

**12.** The exceptional circumstances rule only encompassed intentional torts, and the tort of legal malpractice did not fall within the rule. *Macke*, 931 S.W.2d at 178 (citing *Mark Twain Kansas City v. Jackson*, 912 S.W.2d 536, 538 (Mo.Ct.App.1995); *Rose v. Summers, Comp-*

*ton, Wells & Hamburg*, 887 S.W.2d 683, 686 (Mo.Ct.App.1994)).

**13.** As the issue was before the court on a motion for summary judgment, to survive the plaintiff had to plead and produce evidence that "(1) [The plaintiff] had a valid business relationship or expectancy; (2) [the attorney] knew of the relationship or expectancy; (3) [the attorney] intentionally interfered in inducing or causing breach of the relationship or expectancy; (4) the absence of justification; and (5) resulting damages." *Macke*, 931 S.W.2d at 180 (citing *Nazeri v. Missouri Valley College*, 860 S.W.2d 303, 316 (Mo. 1993)).

business relationship, and that the attorney had intentionally induced or caused a breach of that relationship causing damage to the plaintiff. *Id.* at 180. Therefore, the issue was whether the plaintiff had proffered evidence to meet its burden of proving the final element: lack of justification—"the absence of any legal right to take the actions which form the basis of the claim." *Id.* at 181 (citing *SSM Health Care, Inc. v. Deen*, 890 S.W.2d 343, 346 (Mo.Ct.App.1994)). The court then looked to previous applications of the privilege and determined:

> The rationale for a privilege to protect attorneys when representing clients has long been recognized by the Missouri Supreme Court, which acknowledged that "[i]f attorneys cannot act and advise freely and without constant fear of being harrassed by suits and actions at law, parties could not obtain their legal rights."

> It is only logical that the attorney should be privileged to advise and to act for a client, even though that advice, if wrong, may cause a client to tortiously interfere with another's business relationship of expectancy. Otherwise, there is a "serious risk of interfering [with] an attorney's ability to exercise independent judgment for the client with undivided loyalty."

*Id.* at 181 (internal citations omitted). The court in *Macke* also emphasized that the Restatement (Second) of Torts §§ 770, 772 (1977) recognized analogous privileges in the area of tortious interference. *Id.* In *Macke*, the court ultimately concluded that a privilege for attorneys exists when the attorney:

> [A]cting within the scope of the attorney-client relationship, to advise and to act for a client even though that advice, if wrong, may cause a client to tortiously interfere with another's busi-

ness relationship or expectancy *so long as the attorney does not employ wrongful means* and acts with good faith to protect the interests of the client and not for the attorney's self interest. *"In the context of tortious interference, improper means are those that are independently wrongful, such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade, or any other wrongful act recognized by statute or common law." Nazeri*, 860 S.W.2d at 317.

> *So long as [the attorney's] conduct in representing [his client] brings him within the privilege, the exceptional circumstances rule will not apply to make him liable to a third party such as [plaintiff].* Therefore, in order to prove that [the attorney] is not privileged, [plaintiff] must prove that [the attorney] utilized threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade, or any other wrongful act recognized by statute or common law; was not acting in good faith for the interest of his client; or was motivated by self interest.

*Id.* at 182 (internal citation omitted) (emphasis added). The court then found that the plaintiff failed to produce evidence that would demonstrate the use of improper means or self-interest, or evidence that the attorney was not acting in good faith to protect his client's interest, and, therefore, the court held that the attorney's actions fell within the privilege and the defendant attorney had immunity. *Id.*

Just as our Supreme Court in *Simpson* found decisions from other jurisdictions persuasive, we also find the decisions of the Hawaii Supreme Court in *Kahala* and the Missouri Court of Appeals in *Macke* persuasive, noting in pertinent part that each of them held that the privilege may apply to the *conduct* of an attorney prior

to the commencement of litigation. As both courts held, however, the privilege, as it pertains to conduct prior to the commencement of litigation, is not, and should not be a blanket privilege.

When our Supreme Court in *Simpson* expanded the privilege to encompass defamatory communications made prior to the commencement of litigation, the court placed limits on the applicability of the privilege by the use of the words "if" and "only," as the following quotes reveal. *Simpson*, 232 S.W.3d at 24.

> [T]he communication at issue is protected by the privilege *if* (1) the communication was made by an attorney acting in the capacity of counsel, (2) the communication was related to the subject matter of the proposed litigation, (3) the proposed proceeding must be under serious consideration by the attorney acting in good faith, and (4) the attorney must have a client or identifiable prospective client at the time the communication is published. The privilege will not apply unless each of these elements is satisfied.

*Id.*[14] (emphasis added). The court then noted that the comments to section 586 of the Restatement provide that the privilege applies *only* when "made by an attorney

while performing his function as such. Therefore it is available *only* when the defamatory matter has some reference to the subject matter of the proposed or pending litigation."[15] *Id.* (quoting Restatement (Second)of Torts § 586 cmt. c.) (emphasis added). The Court then concluded that:

> [T]he privilege applies *only* when there is a reasonable nexus between the publication in question and the litigation under consideration. Further, the comments provide that "[a]s to communications preliminary to a proposed judicial proceeding the rule stated in this Section applies *only* when the communication has some relation to a proceeding that is contemplated in good faith and under serious consideration." [Restatement (Second)of Torts § 586 cmt. e.] Accordingly, the "bare possibility that the proceeding might be instituted is not to be used as a cloak to provide immunity for defamation when the possibility is not seriously considered." [Restatement (Second) of Torts § 586 cmt. e.] *These requirements accurately reflect the parameters of the privilege as we have adopted it.*

*Simpson*, 232 S.W.3d at 24 (emphasis added).[16]

14. The court went on to explain that the privilege is consistent with the Restatement view that:

> An attorney at law is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as part of, a judicial proceeding in which he participates as counsel, *if* it has some relation to the proceeding.

*Simpson*, 232 S.W.3d at 24 (quoting Restatement (Second) of Torts § 586 (1977)) (emphasis added).

15. The fact that limitations were placed on the privilege by our Supreme Court is also evident from the following statement in

*Simpson:* "In light of these alternative remedies, *coupled with the limitations we have placed on the privilege itself,* we are satisfied that the privilege cannot be exploited as an opportunity to defame with impunity." *Simpson*, 232 S.W.3d at 27 (emphasis added).

16. The Court further stated:

> The rule we have adopted today is also consistent with our prior cases that have embraced the privilege on the basis that "access to the judicial process, freedom to institute an action, or defend, or participate therein without fear of the burden of being sued for defamation is so vital and necessary to the integrity of our judicial system that it must be made paramount." *Jones,*

We find it significant that the court stated at the end of the paragraph, "[t]hese requirements accurately reflect *the parameters of the privilege ....*" *Id.* (emphasis added). This is significant because the litigation privilege in Tennessee is an "absolute privilege," which cannot be defeated, in contrast to a "conditional" or "qualified" privilege which can be defeated.[17] *See id.* at 22. Our Supreme Court has repeatedly stated that the litigation privilege in Tennessee is an absolute privilege; nevertheless, the Court has also stated that the attorney's conduct must come within strict parameters, the "contours" of the privilege, as the use of the qualifiers *if* and *only* in *Simpson* reveal, in order for the privilege to apply. Thus, attorneys in Tennessee are *only* entitled to immunity under the litigation privilege *if* the conduct at issue falls within certain parameters.

■ Following the precedent established by our Supreme Court in *Simpson,* and by integrating the persuasive reasoning stated by the Supreme Court of Hawaii in *Kahala* and the Court of Appeals of Missouri in *Macke,* we have concluded that the litigation privilege in Tennessee applies to an attorney's conduct prior to the commencement of litigation if (1) the attorney was acting in the capacity of counsel for a client or identifiable prospective client when the conduct occurred, (2) the attorney was acting in good faith for the benefit of and on behalf of the client or prospective client, not for the attorney's self interest, (3) the conduct was related to the subject matter of proposed litigation that was under serious consideration by the attorney, and (4) there was a real nexus between the attorney's conduct and litigation under consideration.[18] *See Simpson,* 232 S.W.3d at 24.

■ In the context of conduct of an attorney that is alleged to constitute tortious interference with contractual rights of a client's adversary or potential adversary, the conduct shall not be privileged if the attorney employed wrongful means. *See Macke,* 931 S.W.2d at 181; *see also Nazeri,* 860 S.W.2d at 317. In this context, wrongful means includes, *inter alia,* fraud, trespass, threats, violence, or other criminal conduct. *See Macke,* 931 S.W.2d at 181; *Nazeri,* 860 S.W.2d at 317.

### SUMMARY JUDGMENT

The trial court granted Cohen summary judgment upon the finding that Cohen was

---

360 S.W.2d at 51. In our view, the rationale underlying the privilege-to encourage attorneys to speak freely and candidly, undeterred by the fear of an action for defamation-is just as compelling when the attorney is advising a prospective client of opportunities to pursue legal redress as it is when the attorney is conferring with an existing client. That the attorney is consulting with a prospective client prior to the filing of a case should not, by itself, defeat the privilege.
*Simpson,* 232 S.W.3d at 24.

17. "A privilege is described as absolute when it is not defeated by the defendant's malice, ill-will, or improper purpose in publishing the defamatory communication." *Simpson,* 232 S.W.3d at 22 (citing Dan B. Dobbs, The Law of Torts 1153 (2000)). "Thus, an absolute privilege is, in effect, a complete immunity." *Id.* (citing Dobbs, The Law of Torts; Restatement (Second) of Torts [§] 243 (1977)) ("the privilege, or immunity, is absolute and the protection that it affords is complete"). *Simpson* further explained that a conditional privilege, also known as a qualified privilege, is not absolute for it "may be defeated if the defamatory publication was made with malice, ill-will, or for an improper purpose." *Id.* (citing *Pate v. Serv. Merch. Co.,* 959 S.W.2d 569, 576–77 (Tenn.Ct.App.1996); Dobbs, *supra* 1158).

18. These parameters are derived from *Simpson,* with modification as it pertains to conduct instead of communication. *See Simpson,* 232 S.W.3d at 24.

immune because he was acting in his capacity as attorney for a client even though litigation was not pending when Cohen negotiated and/or drafted the indemnification agreement and when he took the sworn statement.

■ The undisputed facts demonstrate that Cohen was acting in the capacity of counsel for his client, Kerry Steel Company, Inc., when he negotiated and/or drafted the indemnity agreement and questioned Liberato during the taking of his sworn statement. The facts also show that Cohen was acting in good faith to protect or further the interests of his client, and not for his own self-interest, that there was a real nexus between his conduct and litigation under consideration, and that Cohen did not employ wrongful means.

A party is entitled to summary judgment if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04; *Stovall v. Clarke*, 113 S.W.3d 715, 721 (Tenn.2003). Cohen has done just that. We, therefore, affirm the summary dismissal of the claim against Cohen.

## TENNESSEE RULES OF PROFESSIONAL CONDUCT

Although we have ruled in favor of attorney Cohen in the context of the litigation privilege as it pertains to claims brought by a client's adversary, we believe we are professionally bound to encourage attorneys who read this opinion to consider a lawyer's responsibilities in the context of the Tennessee Rules of Professional Conduct. Rule 4.2 of the Tennessee Rules of Professional Conduct states: "In communicating with a current or former agent or employee of an organization, *a lawyer shall not solicit or assist in the breach of any duty of confidentiality owed by the agent to the organization*." (emphasis added).

■ A violation of a Rule of Professional Conduct does not give rise to a cause of action, as is specifically stated within the rules;[19] thus, if Cohen's conduct constituted a violation, that conduct would not give rise to a cause of action in this case. However, an attorney is subject to sanctions for conduct that violates the Tennessee Rules of Professional Conduct. As our Supreme Court explained in *Simpson:*

> [E]ven if the requirements of the [litigation] privilege are satisfied, an attorney who exceeds the bounds of permissible conduct may face collateral consequences. For example, an attorney who makes false and defamatory statements which result in a baseless lawsuit may face a malpractice action by the client or a malicious prosecution action by the party defamed or both. *Finkelstein,* 774 A.2d at 346. An attorney who institutes meritless litigation or files suit for an improper purpose may also face sanctions imposed by the courts under Rule 11 of the Tennessee Rules of Civil Procedure. In addition, an attorney may be disciplined by the Board of Professional

---

19. "Violation of a Rule should not give rise to a cause of action, nor should it create any presumption that a legal duty has been breached. The Rules are designed to provide guidance to lawyers and to provide a structure for regulation conduct through disciplinary agencies. They are not designed to be a basis for civil liability." Tenn. Sup.Ct. R. 8, RPC, Scope, para. 6; *see also Akins v. Edmondson,* 207 S.W.3d 300, 307–08 (Tenn. Ct.App.2006) (citing *Wood v. Parker,* 901 S.W.2d 374, 379 (Tenn.Ct.App.1995)) (holding "the Rules of Professional Responsibility do not establish a standard of care upon which a legal cause of action can be based").

Responsibility for violating ethical requirements which prohibit the filing of frivolous claims or soliciting employment by means of fraud or false or misleading statements. *See* Tenn. Sup.Ct. R. 8, RPC 3.1, 7.1, 7.3. These alternative remedies for attorney misconduct present "the risk of punishment for the errant lawyer ... real enough to require that lawyer to beware." *Finkelstein,* 774 A.2d at 346. In light of these alternative remedies, coupled with the limitations we have placed on the privilege itself, we are satisfied that the privilege cannot be exploited as an opportunity to defame with impunity.

*Simpson,* 232 S.W.3d at 27.

Accordingly, it must be emphasized that an attorney's immunity from civil liability does not preclude other consequences, such as sanctions from the Board of Professional Responsibility.

### In Conclusion

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against Unarco Material Handling, Inc.