IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 2, 2023 Session

**RAYMOND T. THROCKMORTON, III, ET AL. V.
STEVEN L. LEFKOVITZ, ET AL.**

**Appeal from the Chancery Court for Davidson County
No. 20-1264-BC      Anne C. Martin, Chancellor**

---

**No. M2022-01124-COA-R3-CV**

---

The plaintiff attorneys filed this action alleging tortious interference with a business relationship and unlawful procurement of breach of contract, Tennessee Code Annotated section 47-50-109, against the defendant attorney and his law firm for his defense of their former clients in an action to recover fees. The trial court granted summary judgment in favor of the defendant attorney and the law firm. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which W. NEAL MCBRAYER and JEFFREY USMAN, JJ., joined.

Michael F. Braun, Nashville, Tennessee, for the appellants, Raymond T. Throckmorton, III, Susan B. Evans, and Terrance McNabb.

Jonathan Cole, Nashville, Tennessee, and Nora A. Koffman, Johnson City, Tennessee, for the appellees, Steven L. Lefkovitz and Lefkovitz and Lefkovitz, PLLC.

**OPINION**

**I.      BACKGROUND**

Vickie and Wayne Woelk owned real property in Davidson County, Tennessee (the "Property") that became disputed. In 2015, the Woelks retained attorneys Raymond Throckmorton, III, Susan B. Evans, and Terrance McNabb (collectively "Plaintiffs") to represent them in asserting their claim for the Property in the Davidson County Chancery Court. Plaintiffs recall that the Woelks were difficult clients who "had trouble with money

for years." At the time of the Woelks' Property dispute, Mr. Woelk told Plaintiff McNabb that he was broke and could not "pay any money at all" for expenses or attorney fees. Mr. Woelk's main goal at the time was to recover the Property. On this point, Plaintiff McNabb testified in a later deposition:

> But the property was [Mr. Woelk's] main issue. We told him—or I told him that if we get the property back, then if that's all that happens, then we have to consider that as being the basis for a fee. He understood that. We talked about it even before I talked to Mr. Throckmorton and Sue [Evans] about it.

Plaintiff Evans also recalled that the Woelks were not interested in suing for money damages, but simply wanted the Property returned to them. Similarly, in a later deposition, Plaintiff Throckmorton related:

> We had such a hard time with Woelk. You know he was, quote, broke, he said, at the time. He had lots of assets, but no liquidity. He had no cash liquidity. He had no available funds to retain us. So we took the case on a contingency, and we discussed what, you know, a recovery might look like. It was very difficult to explain it to [Mr. Woelk] in terms that he could comprehend, or, more importantly, that he wanted to comprehend.

In any event, Plaintiffs decided to accept the Woelks as clients and to accept the Woelks' idea of working on a contingency basis. Plaintiff Evans testified that Plaintiffs used their "standard contingency fee contract that [they] used on other cases." Specifically, on November 23, 2015, Plaintiffs and the Woelks executed an "Agreement Regarding Attorney Fees" ("the contract") which read, in part:

> The client hereby employs the attorneys to perform all necessary legal and related services in connection with the above-mentioned matter.

> The fee arrangement described below will cover all our services in this cause, including our services for negotiating a satisfactory settlement of your claim. We shall not agree upon any settlement or compromise of your claim without your prior consent to such settlement or compromise. On your part, you agree to cooperate fully with us as your lawyers, and you agree that we shall have the exclusive right to handle your case and to negotiate with any and all parties toward a compromise and settlement. If the client(s) does not cooperate [with] the attorneys, the attorneys are authorized to withdraw from the case.

If there is a recovery in this case, the attorneys' [fee] will be thirty-three and 1/3rd (33.3%) percent of the recovery plus expenses if we settle your case prior to filing suit. Fees will be forty (40%) percent of the recovery plus expenses if suit is filed. This agreement does not include fees for any appeal of this case. The calculation of the attorneys' fee is based on the total amount of the recovery. Then the attorneys' fee is subtracted from the total recovery, and then any expenses which have been advanced by the attorneys on the client's behalf, will be recovered (subtracted) from the remaining amount. Expenses include things like filing fees, costs of depositions, photocopying charges, long distance telephone calls, faxes, travel expenses, medical records and expert fees, etc., which are necessarily incurred while pursuing your claim. Our firm will advance case expenses on your behalf. At the conclusion of the case, the expenses advanced by our office will be recovered from your share of the proceeds, in addition to the attorneys' fee as applicable. The client, therefore, receives an amount equal to the recovery less the attorneys' fees and less expenses. Again, in the event there is no recovery in this case, you will not be liable for any attorney's fees nor for any expenses, except for filing fees and the associated costs referred to above.

The term "recovery" was not a defined term in the contract.

Plaintiffs consistently testified that they had a difficult time explaining the contract's terms to Mr. Woelk. Yet, Plaintiff Throckmorton also related that he thought it unnecessary to define the term "recovery" in the contract because Mr. Woelk understood it at the time and he expressed his understanding. Plaintiff Throckmorton described overall interactions with his then-client as follows: "Every time you start a conversation with [Mr. Woelk] about anything, you always start back over in Genesis 1:1 every single time. . . . [E]verything is a heated exchange and heated discussion and negotiation. He has to renegotiate everything every single time."

The Property dispute proceeded to trial in July 2018. The court voided the previous transaction involving the Property ab initio, but awarded no monetary damages. Thus, the Woelks succeeded at trial and their ownership of the Property was restored. The Woelks were obligated to pay the opposing party in the Property dispute $59,000, and they did so by borrowing money from a friend. Plaintiffs sought attorney fees on behalf of the Woelks, but their request was denied by the trial court hearing the underlying Property dispute. The court's order became final in December 2018.

Shortly thereafter, the Woelks found a potential buyer to whom they would sell the Property and entered into a contract for purchase and sale of real estate dated December 19, 2018. That contract specified a purchase price of $1,275,000. Plaintiffs submitted a

fee claim for $510,000 (40%) based upon the Property's possible sale price of $1,275,000. As stated by Plaintiffs, the "Woelks did not want to pay an attorney fee of $510,000 for Plaintiffs' services." The Woelks disputed the amount of the fee claim and refused payment. Then, they hired Steven L. Lefkovitz ("Attorney") of Lefkovitz and Lefkovitz, PLLC, to represent them in their dispute of the attorney fee claim. Attorney has primarily practiced bankruptcy law since the seventies. As to how Attorney and his law firm became involved in the fee disagreement between Plaintiffs and the Woelks, his undisputed testimony was:

> Q. Had you ever met [the Woelks] before?
>
> A. No.
>
> Q. Had you ever been familiar with them in any way?
>
> A. No.
>
> Q. Okay. Tell us the first date that you heard of them as a potential client.
>
> A. I got a telephone call from Dan Alexander, who is an attorney in that office, and Dan called up and said, "I have a client I want to send over to you and they have a fee dispute []. Do you think bankruptcy could help?" And I said, "I don't know. Let me talk to them." It was an evening appointment— I don't recall the date—where [the Woelks] came in and we talked about it. They told me that they had—they were having an ongoing dispute over the attorney's fees and wanted to know if I could do anything. I looked at their fee agreement. I thought it was ambiguous due to the use of the word "recovery," and I told them there might be grounds to challenge it. And I told them that bankruptcy court deals with fair[ness] and reasonableness of fees all the time and that may be an option. But I said, "These are lawyers. Let's talk to them first." And that was what necessitated the various [future] meetings [with Plaintiffs].

Attorney was paid a $15,000 flat fee for his representation of the Woelks before he or the law firm took any action on their behalf. Attorney did not have a written representation agreement with the Woelks. Attorney later testified that he charged a flat fee in this instance because, by then, the Woelks "thought that they were being gouged" by Plaintiffs.

Attorney and Mrs. Woelk met with Plaintiff Throckmorton at which time Mrs. Woelk introduced Attorney as "our new counsel." Plaintiff Throckmorton understood that

Attorney was representing the Woelks at that point. He cut the meeting with Attorney and Mrs. Woelk short, citing the need to have Plaintiff Evans and Plaintiff McNabb present. Later, Plaintiffs and Attorney met to discuss settlement of the attorney fee claim. During the meeting, Attorney advised that the Woelks would be willing to pay as much as $200,000 toward Plaintiffs' attorney fees, discussed his legal theory that the term "recovery" in the contract was vague, and discussed the possibility of the Woelks' filing for bankruptcy if a resolution could not be reached. The meeting became contentious. Attorney felt as though Plaintiffs were laughing at him, prompting Attorney to advise Plaintiffs that he would "f**k them out of their fees." Plaintiff Throckmorton later testified that, at the time, his and Attorney's understanding was that the Woelks "were not bankrupt in terms of no assets, [but] that they had a liquidity problem, and that they didn't think it was fair to honor the contract they had signed."

Plaintiffs filed a petition for judgment for attorney fees against the Woelks on January 17, 2019, in the same court which had heard the Property dispute. The Woelks, through Attorney, filed for Chapter 11 bankruptcy on February 4, 2019, in the United States Bankruptcy Court for the Middle District of Tennessee. The Bankruptcy Court assumed jurisdiction of Plaintiffs' attorney fee claim against the Woelks. Plaintiffs, as creditors, were represented by a bankruptcy attorney during the proceedings in the Bankruptcy Court.

On March 22, 2019, the Woelks filed a motion for the Bankruptcy Court's approval to sell the Property free and clear of liens, claims, encumbrances, and interest. Plaintiffs filed a limited objection to that motion. During the 341 meeting of creditors,[1] Mrs. Woelk expressed interest in pursuing a mediated settlement of Plaintiffs' claim for attorney fees. She stated that Plaintiffs should be paid, although she did not believe the amount of fees they sought were "fair." Plaintiffs and the Woelks jointly requested a judicial settlement conference. The parties came to a settlement that allowed the Property to close and awarded $350,000 to Plaintiffs in settlement of their fee claim. Plaintiffs were parties to an agreed order resolving their limited objection and the lien they had filed against the Property, thus allowing the sale to proceed. The sale of the Property closed in June 2019. The sale price was $1,275,000. The settlement agreement stated that the 2015 contingency fee contract between Plaintiffs and the Woelks "was a valid and enforceable agreement for legal representation." It further stated that the "parties agree to reduce the fees payable under the [contract] to $350,000, including expenses" and that "[t]he parties hereby release each other from any and all claims known and unknown in any way related to the engagement letter and the representation thereunder and the claim in the bankruptcy case asserted by [Plaintiffs]." Plaintiff Throckmorton later testified that Plaintiffs chose to settle their attorney fee claim with the Woelks because "it's a matter of economics. You have to evaluate time and evaluate money. At the time, we had to come to a conclusion."

---

[1] *See* 11 U.S.C. § 341.

On June 17, 2019, the United States Trustee moved to convert the Woelks' Chapter 11 case to Chapter 7. Before the United States Trustee's motion was heard, the Woelks submitted a proposed order to dismiss their bankruptcy action. That order and the final decree of dismissal of the Chapter 11 case were entered on July 25, 2019, and August 13, 2019, respectively.

Plaintiffs brought this action in the Davidson County Circuit Court on January 7, 2020, against Attorney and his law firm for tortious interference with a business relationship and unlawful procurement of breach of contract pursuant to Tennessee Code Annotated section 47-50-109.[2] Plaintiffs alleged that Attorney and his law firm "filed an illegitimate bankruptcy on [the Woelks'] behalf" and were "the direct and proximate cause" of the breach of the contract between the Woelks and Plaintiffs. They sought to recover $160,000, representing the difference in the $350,000 fee the Woelks paid pursuant to the bankruptcy settlement and the $510,000 fee Plaintiffs originally sought, plus $2,670 in expenses, plus statutory damages. Attorney and the law firm asserted affirmative defenses, including the litigation privilege, in their answer. On January 21, 2021, the case was transferred to the Business Court Pilot Project in the Davidson County Chancery Court ("trial court").

On May 20, 2022, Attorney and the law firm moved for summary judgment, asserting that Plaintiffs' evidence was insufficient to satisfy the elements of tortious interference with a business relationship and of unlawful procurement of breach of contract pursuant to Tennessee Code Annotated section 47-50-109. They further asserted that the litigation privilege, as discussed in *Unarco Material Handling, Inc. v. William Liberato et al.*, 317 S.W.3d 227 (Tenn. Ct. App. 2010) and *The Law Offices of T. Robert Hill PC v. Lewis Cobb*, No. W2020-01380-COA-R3-CV, 2021 WL 2172981 (Tenn. Ct. App. May 27, 2021), precluded Plaintiffs' recovery. The motion for summary judgment was supported by the depositions of Attorney and of Plaintiffs, as well as a statement of undisputed material facts. In response, Plaintiffs argued that Attorney filed the Chapter 11 bankruptcy petition for the Woelks solely to force a renegotiation of their contract with Plaintiffs. Plaintiffs further asserted that Attorney "illegally manipulated the Chapter 11 bankruptcy law to induce [the Woelks] to break their contract with the Plaintiffs." Regarding the litigation privilege asserted by Attorney, Plaintiffs responded that genuine

---

[2] "It is unlawful for any person, by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto; and, in every case where a breach or violation of such contract is so procured, the person so procuring or inducing the same shall be liable in treble the amount of damages resulting from or incident to the breach of the contract. The party injured by such breach may bring suit for the breach and for such damages."

issues of material fact existed as to whether Attorney employed "wrongful means" under *Unarco*, such that his conduct would not be protected by the litigation privilege.[3]

Following a July 12, 2022 hearing, the trial court granted summary judgment in favor of Attorney and the law firm by order entered July 22, 2022. The trial court found that bankruptcy was a legitimate and viable option for the Woelks to pursue and that Plaintiffs could have objected within the bankruptcy proceeding itself if they thought otherwise. The trial court additionally noted Plaintiffs' admission that Attorney did not lie to them and Plaintiff Throckmorton's testimony that he had no evidence that Attorney was acting in self-interest other than by receiving an attorney fee of $15,000. The court further found that the litigation privilege applied to Attorney and his law firm:

> The Court cannot find that [Attorney and the law firm] engaged in conduct that is actionable and/or outside the litigation privilege. [They] were retained to advise [the Woelks] regarding options, including bankruptcy. The clients had an obligation from which they were seeking relief through bankruptcy. [Attorney and his law firm] filed the bankruptcy on their behalf and successfully resolved their dispute with Plaintiffs. For Plaintiffs to use that process to settle with the Woelks, and then come to this Court and assert the bankruptcy was illegitimate and not protected by a litigation privilege, is not well taken.

Plaintiffs appealed.

## II. ISSUES

The dispositive issue is whether the trial court erred in granting summary judgment on Plaintiffs' claims of (A) tortious interference with a business relationship and (B) unlawful procurement of breach of contract.

---

[3] *See Unarco*, 317 S.W.3d at 238 ("In the context of conduct of an attorney that is alleged to constitute tortious interference with contractual rights of a client's adversary or potential adversary, the conduct shall not be privileged if the attorney employed wrongful means. In this context, wrongful means includes, inter alia, fraud, trespass, threats, violence, or other criminal conduct.") (internal citations omitted).

## III.   STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Tenn. R. Civ. P. 56.04.

When a party moves for summary judgment but does not have the burden of proof at trial, the moving party must either submit evidence "affirmatively negating an essential element of the nonmoving party's claim" or "demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense."  *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 264 (Tenn. 2015).  Once the moving party has satisfied this requirement, the nonmoving party "'may not rest upon the mere allegations or denials of [its] pleading.'"  *Id*. at 265 (quoting Tenn. R. Civ. P. 56.06).  Rather, the nonmoving party must respond and produce affidavits, depositions, responses to interrogatories, or other discovery that "set forth specific facts showing that there is a genuine issue for trial."  Tenn. R. Civ. P. 56.06; *see also Rye*, 477 S.W.3d at 265.  If the nonmoving party fails to respond in this way, "summary judgment, if appropriate, shall be entered against the [nonmoving] party."  Tenn. R. Civ. P. 56.06.

In reviewing a summary judgment motion on appeal, "we are required to review the evidence in the light most favorable to the nonmoving party and to draw all reasonable inferences favoring the nonmoving party."  *Shaw v. Metro. Gov't of Nashville & Davidson Cnty*., 596 S.W.3d 726, 733 (Tenn. Ct. App. 2019) (citations and quotations omitted).  Appellate review of a trial court's ruling granting a motion for summary judgment is de novo, with no presumption of correctness.  *Rye*, 477 S.W.3d at 250 (citation omitted).  Under the de novo standard of review, we must "make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied."  *Id*. (citation omitted).

## IV.   DISCUSSION

### A.

Plaintiffs argue that the trial court erred by granting summary judgment in Attorney and the law firm's favor on the claim of tortious interference with a business relationship. This same claim was pleaded in the plaintiff's complaint in *Trau-Med of America, Inc. v. Allstate Insurance Company*, 71 S.W.3d 691, 694 (Tenn. 2002).  In *Trau-Med*, the Tennessee Supreme Court "expressly adopt[ed] the tort of intentional interference with

business relationships." *Trau-Med*, 71 S.W.3d at 701.  The Court defined the elements of the tort as follows:

> (1) An existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and finally, (5) damages resulting from the tortious interference.

*Id*.

The parties stipulate that the first two elements are satisfied because there was a business relationship between Plaintiffs and the Woelks and because Attorney and his law firm knew about it.  Regarding the third element, in response to the statement of undisputed facts, Plaintiffs admitted for summary judgment purposes that, "The Woelks did not believe Plaintiffs were due $510,000 in attorneys' fees."  It is also undisputed that: (1) well before Attorney became involved, Plaintiffs found the Woelks to be difficult clients who had money trouble for years; (2) the Woelks first refused to pay Plaintiffs the $510,000 fee demand under the contract and then were referred to Attorney through Dan Alexander; (3) Attorney and the Woelks had never met or heard of each other before the referral; and (4) the Woelks approached Attorney specifically seeking his assistance to be relieved from the amount of fees Plaintiffs had requested.  In response to this undisputed evidence, Plaintiffs claimed that Attorney's remark that he would "f\*\*k them out of their fees" is evidence of Attorney's intent to cause the breach or termination of their business relationship with the Woelks.  We conclude that Attorney's vulgarity alone, which Plaintiffs acknowledged was said in frustration, does not create a genuine issue for trial regarding Attorney's or the law firm's intent to cause the breach or termination of the business relationship between Plaintiffs and the Woelks.  The undisputed evidence shows that the Woelks contested the amount of the fee and refused payment before Attorney or his law firm entered the picture.[4] Attorney could not intend to cause a breach or termination of the business relationship when such breach had already occurred before his involvement.

---

[4] As Plaintiffs phrased this fact in their response to the motion for summary judgment, "Despite the highly favorable result obtained for them as a result of the Plaintiffs' work, the Woelks were none too happy to pay an attorney fee of $510,000.  Their complaints led to the Plaintiffs filing a Petition for Judgment for Attorneys' Fees on January 17, 2019 in th[e] same Court."

Moreover, with respect to the fourth element requiring an improper motive or improper means, we agree with the trial court that bankruptcy was a viable means by which the Woelks could obtain relief from the fee. On appeal, Plaintiffs point to several alleged deficiencies in the Woelks' bankruptcy petition and associated documentation, which they claim render the bankruptcy "deceitful" and "illegitimate."[5] Based on the record before us, Plaintiffs did not raise these issues in the bankruptcy court. Instead, Plaintiffs participated in the bankruptcy process to negotiate a settlement agreement with respect to their claim. If Plaintiffs believed that the Woelks' bankruptcy was "illegitimate" or in bad faith, it was incumbent upon them to raise those issues before the Bankruptcy Court.

Regarding the element of improper motive or improper means, our Supreme Court instructed:

> It is clear that a determination of whether a defendant acted "improperly" or possessed an "improper" motive is dependent on the particular facts and circumstances of a given case, and as a result, a precise, all-encompassing definition of the term "improper" is neither possible nor helpful. However, with regard to improper motive, we require that the plaintiff demonstrate that the defendant's predominant purpose was to injure the plaintiff.

*Id*. at 701 n.5.

In this case, Plaintiffs have failed to demonstrate that Attorney's predominant purpose in advising the Woelks on their bankruptcy was to injure Plaintiffs. Rather, the undisputed facts show that Attorney suggested that the Woelks first speak directly with Plaintiffs before taking further action. Attorney testified that he believed the contractual language between Plaintiffs and the Woelks could be challenged for ambiguity and used the bankruptcy as a means to resolve his clients' dispute. Plaintiffs' deposition testimony was clear that the Woelks had long-term financial trouble and "no cash liquidity." Attorney candidly discussed this reality with Plaintiffs and advised that the Woelks would seek bankruptcy if a negotiated resolution was out of reach. After filing bankruptcy, the Woelks successfully reached a settlement agreement to reduce and pay Plaintiffs' claim. There is no evidence in the appellate record that the United States Trustee objected in the Woelks'

---

[5] Plaintiffs allege, *inter alia*, that: (1) the bankruptcy petition does not list the $59,000 payment the Woelks made to the opposing party in the Property dispute, which could constitute a preference under the Bankruptcy Code; (2) Attorney did not disclose the date he received his $15,000 fee; (3) Attorney never filed what is commonly referred to as a Currency Transaction Report ("CTR") or IRS Form 8300 with regard to his $15,000 fee; (4) Attorney never filed the required application for employment in the bankruptcy case; (5) the petition listed the Property's value at only $507,000; and (6) Attorney has not been able to provide the required original "wet" signatures from either of the Woelks for their bankruptcy petition.

bankruptcy nor that the Bankruptcy Court found the Woelks' filing to have been made in bad faith. Therefore, we conclude that Plaintiffs have failed to establish the element of improper motive or improper means.

Attorney and the law firm demonstrated that Plaintiffs' evidence at the summary judgment stage is insufficient to establish a claim of tortious interference with a business relationship. *Rye*, 477 S.W.3d at 264. Plaintiffs, as the nonmoving party, had to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party." *Rye*, 477 S.W.3d at 265. Upon de novo review of the entire record and the parties' arguments, we have determined that Plaintiffs did not meet their burden in responding to the motion for summary judgment because they failed to set forth specific facts showing a genuine issue for trial as to the third and fourth elements of their claim. Tenn. R. Civ. P. 56.06. Accordingly, we affirm the trial court's grant of summary judgment on Plaintiffs' claim for tortious interference with a business relationship.

B.

Plaintiffs asserted a claim for unlawful procurement of breach of contract pursuant to Tennessee Code Annotated section 47-50-109 which provides:

> It is unlawful for any person, by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto; and, in every case where a breach or violation of such contract is so procured, the person so procuring or inducing the same shall be liable in treble the amount of damages resulting from or incident to the breach of the contract. The party injured by such breach may bring suit for the breach and for such damages.

Tenn. Code Ann. § 47-50-109. "This section is a codification of the common law tort action and provides for mandatory treble damages if there is a *clear showing* that the defendant induced the breach." *Shahrdar v. Glob. Hous., Inc.*, 983 S.W.2d 230, 238 (Tenn. Ct. App. 1998) (citing *Polk & Sullivan, Inc. v. United Cities Gas Co.*, 783 S.W.2d 538, 542 (Tenn. 1989)). To recover under the statute, the plaintiff must prove that: (1) there was a legal contract; (2) the wrongdoer was aware of the contract; (3) the defendant intended to induce a breach; (4) the defendant acted maliciously; (5) the contract was actually breached; (6) the act complained of was the proximate cause of the breach; and (7) damages resulted from the breach. *Shahrdar*, 983 S.W.2d at 238; *Robinson v. City of Clarksville*,

673 S.W.3d 556, 574 (Tenn. Ct. App. 2023), *Baker v. Hooper*, 50 S.W.3d 463, 468 (Tenn. Ct. App. 2001); *see Polk & Sullivan*, 783 S.W.2d at 543.

Having studied the record, we see that Plaintiffs did not allege malice on the part of Attorney or the law firm in their complaint. Further, Plaintiffs did not put forward any evidence of malice in their response to the motion for summary judgment. For these reasons, we affirm the trial court's grant of summary judgment on Plaintiffs' statutory unlawful procurement of breach of contract claim.

Finally, Plaintiffs argue on appeal that there is a genuine issue of material fact as to whether Attorney employed wrongful means such that his conduct would not be protected by the litigation privilege. Given our conclusion that the evidence at the summary judgment stage is insufficient to establish the elements of the claims set forth in Plaintiffs' complaint, this argument is pretermitted.

## V.    CONCLUSION

For the foregoing reasons, we affirm the trial court's order entering summary judgment. The case is remanded for such further proceedings as may be necessary and consistent with this opinion. Costs of the appeal are taxed to the appellants, Raymond T. Throckmorton, III, Susan B. Evans, and Terrance McNabb.

_____
JOHN W. McCLARTY, JUDGE

- 12 -